CHARLES MOSLER, PLAINTIFF-RESPONDENT, v. FRANCIS
J. WHELAN, DEFENDANT-APPELLANT.

Argued November 5, 1958—Decided December 15, 1958.

398

*Mr. Harry Green* argued the cause for plaintiff-respondent.

*Mr. Pierre P. Garven* argued the cause for defendant-appellant (*Messrs. Garven, Gelman & Hollander,* attorneys).

The opinion of the court was delivered by

FRANCIS, J.   Plaintiff sought compensatory and punitive damages, claiming that defendant had libelled him.   The jury unanimously decided otherwise.   However, the Appellate Division reversed on the ground that the publication in issue was libelous *per se.*   We granted certification.

██   The evidence adduced at the trial might well justify a description of the Borough of Paramus, locale of origin of this controversy, as a seething cauldron of political tempest. Such characterization is not disparaging of the borough, for controversy in political and civic affairs resulting from intense interest on the part of the citizenry ordinarily makes for good and responsible government.   Short tempers, injudicious language and sometimes indecorous insults, although much to be decried, are concomitants of such a scene.   The process of free debate in political controversies and campaigns is a time-honored American tradition.   It is indispensable to our way of life and the law of libel should not be permitted to encroach unduly upon it.   The problem of harmonizing the right of the individual to his good name with the need of a democratic society to full and free expression is frequently a delicate one in the area of politics. The ordinary citizen is well aware that in the day-to-day contest persons engaged in that activity are praised by their adherents and assailed by their adversaries.   He has become accustomed to reading both good and bad comments about the candidates and those associated with them, and he may reasonably be expected to understand that the partisan outpourings are likely to be biased and exaggerated and to accord no greater credence to one viewpoint than to the other.   And so recognition of the social need for freedom of speech has brought with it the doctrine that even though criticism may be captious, illfounded and unjust, it is not

libelous unless it exposes the object thereof to hatred, contempt, ridicule or disgrace or subjects him to loss of the good will and confidence of the community. *Cf. Leers v. Green,* 24 *N. J.* 239, 251 (1957); *Tanzer v. Crowley Publishing Corp.,* 240 *App. Div.* 203, 268 *N. Y. S.* 620 (*App. Div.* 1934).

At all times to be mentioned the plaintiff Mosler was president of the local Democratic Club and in charge of its publicity. His regular business was advertising. He had been campaign manager for the Democratic candidates for councilmen in the general election of November 1955, and he acted in that capacity on behalf of Fred C. Galda, the successful Democratic candidate for mayor in the 1956 primary and general election.

On February 20, 1956 the local Republican nominating committee endorsed Robert A. Renna as its candidate for mayor in the 1956 election in preference to another aspirant. On February 28, 1956 Mosler prepared and issued a press release on behalf of the Paramus Democratic Club, recommending that the Republican Club support Galda. A news story based on it was published in *The Paramus Post* on March 4 and said among other things that such a move would

"[g]ive the split Republican party an opportunity to back non-partisan government and completely reorganize so that on some future date, Republicans will be able to offer men of mayoralty stature in the primaries instead of arguing among themselves about two would-be candidates, both lawyers for real estate developers, and one a Democratic cast-off."

The release also appeared in substance in the *Bergen Evening Record* of February 29, 1956. There the references to Renna and the other contender for the Republican endorsement as "both lawyers for real estate developers" and to Renna as "a Democratic cast-off" were specifically attributed to Mrs. Harry Ferrante, chairman of the Democratic Club executive committee. According to Mrs. Ferrante's testimony the action taken by the committee was substantially as Mosler's release described it, but she denied that she made or authorized the comments attributed

to her. While on the stand, Mosler conceded her repudiation to be factual and indicated that the mention of Mrs. Ferrante did not come from him but sprang from an assumption by the *Record* reporter.

Galda (a friend and political associate of Mosler) and Renna were in opposite camps in the 1955 municipal election. In September of that year, referring to criticism by Renna of a zoning ordinance, Galda said, as noted in a local paper:

"To see a worthy ordinance, a constructive structure of legislation, that means so much to the future of the twenty thousand residents of Paramus * * * jeopardized by selfishness, vindictiveness or the black hand of revenge * * *."

The Black Hand may be defined as a "criminal society first appearing about 1868. Later, when many of its members fled to the United States, they formed the nucleus there of a lawless or blackmailing secret society." *Webster's New International Dictionary, p.* 280 (*2d ed.* 1949). Speculation as to any intended covert sting need not be indulged in. The mention is made only to emphasize the spirit of the campaign.

Renna was originally a Democratic office holder and for some undisclosed reason had joined the opposition. This seems to have stimulated the charge that he was seeking revenge. On October 3, 1955, the *Bergen Evening Record* reported that in speaking of Renna, Mosler said:

"* * * [a]ll those who have worn the label independent so far are nothing more than the voices of this man crying hatred against the present Democratic government."

Mosler conceded authorship of the statement. Similarly, on October 6 the local newspaper recounted (and Mosler admitted at the trial) that he said of Renna and the organization known as Independent Citizens of Paramus:

"They are no more independent than I am, and they are the tools of the Republican party and of the man who has only one thing in his heart and that is revenge."

And in the February 28, 1956 release already referred to, Mosler quoted himself as saying:

"\* \* \* Democrat, Independent, or Republican, Renna will run on any ticket that promises a profitable future."

This background brings us to the defendant Whelan and his activities. He is a resident of Paramus and by occupation a clerk at Curtiss-Wright Corporation. He was president of the Independent Citizens of Paramus, a political group composed of members of both major political parties. He has never sought or held any elective or appointive office in the borough. Whelan, who knew Mosler only casually, having come in contact with him occasionally at meetings, had read the various publicity releases and particularly those of February and March 1956, to which reference has been made. He testified with respect to them:

"Many times I would read and re-read articles concerning issues between the parties, the political parties in the town, and in reading many of the releases by the Democratic group, the previous campaigns, I concluded that someone should express an opinion through the newspapers in opposition to the political campaign tactics employed by Mr. Mosler throughout two or three campaigns and throughout the entire years in which I have read the articles, because I felt definitely they were un-American."

Responding to this motivation, Whelan wrote the letter which provoked the instant libel action. It was published in *The Paramus Post* on March 18, 1956, as follows:

"Dear Editor:

Many thanks to your newspaper for presenting both sides of the inter-party squabble resulting from the article issued in the name of Mrs. Harry Ferrante of the executive committee of the Democratic Club and the answer of Republican candidate for Mayor, Robert A. Renna. My reaction, after reading both sides of the matter, indicated quite clearly to me that Mr. Charles Mosler is definitely influenced in his thinking by a foreign philosophy alien to the American way.

I took the trouble to read many of the articles written by the Democratic Club during the last election. To my utter surprise they contained many personal attacks upon the character of the

opposing candidates. Although Mayor Galda concluded several of the articles which appeared in the newspapers with the paragraph that he detests personal vilification, character assassination and maligning of individuals, yet the remarks in his previous paragraphs contained these very practices which he stated he could not condone. It became quite apparent to me that all of their articles contained attacks on the dignity of his opponents.

The present controversy, which I am given to understand resulted in an inter-party squabble, likewise was written in the same vein. To my mind the source of this type of writing can be attributable to only one man.

It is unfortunate that many upright citizens have found themselves involved in political squabbles as a result of finding their names signed to articles to which they did not fully subscribe. Can it be that Mrs. Ferrante knew nothing about the contents of this article when it was given to the press? Apparently her ire was aroused when she found herself the center of such a controversy.

As a citizen of high integrity she undoubtedly asserted herself in opposition to any future articles bearing her name and containing such unkind remarks leveled against any candidates as to all intents and purposes she is a well informed and sincere woman.

I would further suggest that the real Democrats in town divest themselves of this type of writer, whose un-American tactics upon other citizens have no place in the true American manner of conducting a campaign.

Sincerely yours,
Francis J. Whelan."

The complaint set out the letter in full and alleged the libelous innuendo to be:

"* * * [t]hat plaintiff was a believer in the foreign philosophy known as Communism, that he believed in Communism and was a Communist sympathizer, that he believed in and advocated the use of force or violence to overthrow the Government of the United States or to alter the form of said Government by unconstitutional means, that he engaged in un-American or Communistic tactics upon other citizens and that he did not conduct himself in the manner of a true and loyal American, but that he behaved and conducted himself like a Communist and in accordance with Communistic tactics, in his manner of conducting a political campaign."

The defendant admitted the publication, denied that it was defamatory, and asserted the defenses of fair comment and that the words and language were published without malice and with an honest belief in their truth. The pretrial order reiterated the innuendo and did not extend it any further.

And paragraph 7 thereof referred to the issues as those "hereinabove." The issue framed by the pleadings and the pretrial order therefore was whether the statements that Mosler "is definitely influenced in his thinking by a foreign philosophy alien to the American way," and that "the real Democrats in town [should] divest themselves of this type of writer, whose un-American tactics upon other citizens have no place in the true American manner of conducting a campaign," carry the defamatory connotation that Mosler is a believer in or a practitioner of Communism. The trial court denied plaintiff's motion for a declaration that the words in the entire context of the writing were libelous *per se,* and he refused to limit the function of the jury to the assessment of damages. On the contrary, he held that the writing was capable of the defamatory or an innocent significance and that it was for the jury to say whether the average person who read the statements would have understood them in the defamatory sense.

The Appellate Division disagreed and found the language to be libelous as a matter of law, saying:

"There is *hardly any question*, in our judgment, but that the imputation * * * would suggest to the average American newspaper reader that the object of the description was being portrayed as a Communist or Communist sympathizer or devotee." (Emphasis added.)

And later in the opinion:

"Thus, there being no innocuous meaning in which the words could reasonably be taken, they were defamatory as a matter of law and the trial court should have so declared."

We cannot accept that view.

In the trial of libel cases there is always a preliminary question for the judge to consider: Are the words reasonably capable of a defamatory meaning? If they are vague or ambiguous or reasonably susceptible of legally innocent as well as defamatory significance, it is for the jury to say in the light of the circumstances disclosed by the evidence

and the entire context of the writing whether they were understood to be defamatory by the average reader who saw them. *Leers v. Green, supra,* 24 *N. J.* at *p.* 253; *Morley v. Post Printing & Publishing Co.,* 84 *Colo.* 41, 268 *P.* 540 (*Sup. Ct.* 1928); *Gatley, Libel and Slander* (*4th ed.* 1953), 124; 1 *Harper and James, Law of Torts* (1956), 463–465; *Prosser, Torts* (*2d ed.* 1955), 581; *Restatement, Torts,* § 614. If they are susceptible of a *single* imputation and that one is defamatory, the court must declare them actionable in themselves and limit the issue to that of damages. *Mick v. American Dental Assn.,* 49 *N. J. Super.* 262, 274 (*App. Div.* 1958), *certification* denied 27 *N. J.* 74 (1958); *Moore v. Francis,* 121 *N. Y.* 199, 202–203, 23 *N. E.* 1127, 8 *L. R. A.* 214 (*Ct. App.* 1890).

In the political climate of our time unquestionably it is libelous as a matter of law to describe a person as a Communist or a Communist sympathizer or follower, or to ascribe such a status to him. *Mencher v. Chesley,* 297 *N. Y.* 94, 75 *N. E.* 2d 257 (*Ct. App.* 1947); *Grant v. Reader's Digest Ass'n,* 151 *F.* 2d 733 (2 *Cir.* 1945), *certiorari* denied 326 *U. S.* 797, 66 *S. Ct.* 492, 90 *L. Ed.* 485 (1946); *Annotation,* 33 *A. L. R.* 2d 1196, 1208 (1954). But can it be said with respect to the writing under examination here that the average reader would not reasonably understand it to convey any other imputation? The opinion below placed emphasis on the charge of the use by Mosler of "un-American tactics upon other citizens" and that he "is influenced in his thinking by a foreign philosophy alien to the American way." Imputation of un-American tactics in a political campaign (and the expression should be evaluated as an emanation of that atmosphere, *cf. Dressler v. Mayer,* 22 *N. J. Super.* 129 (*App. Div.* 1952); *Riesman,* "Democracy and Defamation: Fair Game and Fair Comment," 42 *Columbia L. Rev.* 1282 (1942)) may signify many things—from lack of fairness and good manners to terrorism or worse. In its outer reaches "un-American," particularly in political debate, is frequently applied as a rhetorical effusion to any social, economic or governmental program

espoused by an adversary. As the United States Supreme Court said in *Watkins v. United States,* 354 *U. S.* 178, 202, 204, 77 *S. Ct.* 1173, 1 *L. Ed.* 2d 1273 (1957), in discussing the Congressional resolution establishing the Committee on Un-American Activities:

> "It would be difficult to imagine a less explicit authorizing resolution. Who can define the meaning of 'un-American'?"

An earlier article entitled *"Constitutional Limitations on the Un-American Activities Committee,"* 47 *Columbia L. Rev.* 416, 419 (1947), in expatiating upon the same resolution, said:

> "Neither of the key words 'subversive' or 'un-American' has a generally accepted common meaning or an established definition in law. In common parlance they are used interchangeably as political epithets to designate what the user disapproves. The dictionary defines 'un-American' as not * * * consistent with American customs, principles, etc. Since 'American' is not specifically defined, this definition is of little help. The term 'un-American' does not appear in any other legislative enactments, and it has not been judicially defined."

Moreover, the context in which the allusion appears in this case reveals the broad boundaries of its significance. The reference is to un-American tactics used by plaintiff "upon other citizens." Obviously, this relates to the type of articles written by Mosler—about Renna, for example. The indication is that such articles represent "un-American tactics" and "have no place in the *true* American manner of conducting a campaign." Adding to the un-American characterization, the portion of a sentence appearing five paragraphs earlier in the letter—that reading Mosler's article about Renna and "both sides of the matter" suggested to defendant that plaintiff was "influenced in his thinking by a foreign philosophy alien to the American way"—does not signify as the *sole reasonable implication* adherence to or sympathy with the political theories of Communism.

*Spanel v. Pegler,* 160 *F.* 2d 619, 171 *A. L. R.* 699 (*7 Cir.* 1947), is relevant in this connection. Pegler, a newspaper

columnist, issued an article headed: "Communists Go 'Big Business' to Trick U. S." The article first described the activities of one Novick, a manufacturer, who purchased time on the radio in order to interpret the news. It stated that his press agent was "a prominent and aggressive Communist"; that his news interpreter is a convicted thief; that Novick was associated with Communists in a projected new corporation. The second portion of the writing dealt with the plaintiff Spanel and his corporation, and directed attention to points of similarity between the two men. They were compared as natives of Russia, successful manufacturers of war products, and disseminators of political propaganda. One of Spanel's newspaper advertisements in praise of Henry Wallace was described as:

"[w]ell expressing the attitude of some demagogues of the extreme left who regard the American citizen as a soulless lump to be fed, quartered, ordered and disciplined even as a dog.

A native of Russia and an admirer of the Soviet system might be pardoned in the error."

A judgment dismissing the complaint as non-libelous was reversed, the Circuit Court of Appeals saying:

"It does not directly say that plaintiffs are Communists or tools of Communists.
*       *       *       *       *       *       *       *
It is not for us to say whether from our interpretation of the quoted passage and the balance of the article we believe the language characterizes Spanel as a Communist or a Communist sympathizer and whether it alleges his corporation is being used by Communists, because to do so would be to usurp the function of the jury. It is sufficient that we recognize that the article is capable of two meanings, one libelous and the other not. * * * 'Where the words are ambiguous or equivocal in meaning, the question of the meaning to be ascribed to them is for the jury.'" Citing *Ogren v. Rockford Star Printing Co.*, 288 *Ill.* 405, 413, 123 *N. E.* 587 (*Sup. Ct.* 1919).

The Court of Appeals of New York was presented with a similar problem in *Mencher v. Chesley, supra* [297 *N. Y.* 94, 75 *N. E. 2d* 259]. Defendant was dismissed as chair-

man of the War Price and Rationing Board and issued a statement which said among other things:

"I have never been in politics and am not up on that topic, so I can't figure it all out. Maybe the people can. I hope so, I do know that the publicity department of the Regional Office, which started this controversy and which I believe instigated the attack, is directed by Max Mencher, former Daily Worker employee, wizard public relations and stunt man of the Office of War Information, who is for the time being on the OPA payroll. He was campaign manager for Isidore Nagler, Communist candidate for Bronx Borough President in a recent election. Maybe that will help to add up the score."

In sustaining the refusal to dismiss the complaint, Judge Fuld said:

"While in the present case there was no direct charge that plaintiff was a communist or had communist affiliations or that he had misused his public office, the statement, read against the background of its issuance, under the circumstances of its publication, is certainly susceptible of such a construction.

\*     \*     \*     \*     \*     \*     \*     \*

Since, then, we may not say that the imputation of communism is [as] a matter of law not libelous, the jury may find the statement defamatory \* \* \*. In upholding the complaint, however, we do no more than determine that it presents an issue of fact for a jury to decide."

And compare *Julian v. American Business Consultants*, 2 *N. Y. 2d* 1, 155 *N. Y. S. 2d* 1, 137 *N. E. 2d* 1 (*Ct. App.* 1956), dismissing a complaint alleging an aspersion of Communist connections. Judge Fuld, dissenting, felt that a jury question was revealed.

Other analogous instances may be mentioned. It was not considered libelous *as a matter of law* to write "Triangle is on strike due to the stubborn, unreasonable, un-American attitude of Mr. McAuliffe and his anti-labor advisors." *McAuliffe v. Local Union No. 3, Etc., Sup.*, 29 *N. Y. S. 2d* 963 (*Sup. Ct.* 1941); nor to publish an article stating that plaintiff had been named in an American Legion resolution as a "person fostering subversive activities." *Dilling v. Illinois Publishing & Printing Co.*, 340 *Ill. App.* 303,

91 *N. E. 2d* 635 (*App. Ct.* 1950); nor to say in 1944 in an editorial that plaintiff's election would be a victory for Fascism. This was said not to charge plaintiff with being a Fascist, the only inference being that plaintiff's opposition to the Roosevelt administration would be beneficial to Fascism. *Devany v. Shulman,* 184 *Misc.* 613, 53 *N. Y. S. 2d* 401 (*Sup. Ct.* 1944), affirmed 269 *App. Div.* 1022, 59 *N. Y. S. 2d* 401 (*App. Div.* 1945). And it was held not to be inescapably defamatory as imputing Nazi-like tactics to state that plaintiff had made an unannounced "Gestapo-like" entrance into a sick room. It was merely rhetoric descriptive of high-handed conduct. *Schy v. Hearst Pub. Co.,* 205 *F. 2d* 750 (7 *Cir.* 1953). The same ruling was made as to an editorial effusion that a statement by the plaintiff as chairman of the Georgia Democrats was "more in keeping with what you could expect from Hitler and Hirohito, rather than from a Democrat." *Aiken v. Constitution Pub. Co.,* 72 *Ga. App.* 250, 33 *S. E. 2d* 555 (*App. Ct.* 1945).

▮ The sum of our observations on this phase of the matter is that the imputation of Communism or Communistic sympathy in Whelan's publication cannot be deemed its exclusive implication. In so holding, the Appellate Division invaded the province of the jury. Moreover, the opinion proceeded beyond the alleged aspersion of Communism and suggested that even if such imputation is but one to be drawn, any other possible connotation is so defamatory that the court should have limited the trial to damages. *A fortiorari,* this view encroaches even farther into the domain of the jury.

At the trial, plaintiff injected the claim that the writing was defamatory also because in effect it charged him with causing the publication of articles in the names of persons who did not fully subscribe to their contents. The sting was urged to be that Mosler was charged with habitually submitting to newspapers for dissemination spurious writings represented as genuine expressions of the persons named. And it was argued that the imputation was libelous at common law in that it attributed to him conduct which

is morally reprehensible, and because it in effect charged him with the commission of a crime in violation of *N. J. S.* 2*A*:120–1. This theory was not set out in the complaint nor in the pretrial order. Their sole thrust as indicated by the innuendo and as repeated by reference in the pretrial order and by the limitation implicit in paragraph 7 thereof clearly was the imputation of Communism. In cases of this kind, the specific basis for the charge of libel should be made clear and adhered to in the absence of some extraordinary reason for the advancement of additional alleged stings. Otherwise pretrial conferences are a waste of judicial manpower. Similar expansion took place in *Herrmann v. Newark Morning Ledger Co.*, 48 *N. J. Super.* 420, 429 (*App. Div.* 1958). Such a course is incompatible with our present day pretrial preparation.

The language upon which this additional unrelated defamation charge was predicated is:

"It is unfortunate that many upright citizens have found themselves involved in political squabbles as a result of finding their names signed to articles to which they did not fully subscribe. Can it be that Mrs. Ferrante knew nothing about the contents of this article when it was given to the press? Apparently her ire was aroused when she found herself the center of such a controversy."

The Appellate Division declared that these words also constituted libel as a matter of law; that no import other than a defamatory one could reasonably be drawn from them. The conclusion overdraws the statements. The first sentence quoted is simply a general observation and in correlation with the remainder does not charge a violation of the statute. We agree with the trial court that this portion of the letter was a proper subject for consideration by the jury, along with the entire text in deciding whether plaintiff had been defamed.

Extended treatment of the defense of fair comment is not necessary. *Leers v. Green, supra,* contains a full and clear exposition of the subject. Of course, a libel as a matter of law cannot be excused as fair comment. How-

ever, as has been indicated, no such defamation was established and the issue was properly left to the jury.

Plaintiff argues that error was committed in the denial of his motion for mistrial which was predicated upon alleged prejudicial comments of the trial judge. The record has been examined thoroughly and we find no basis for a declaration that anything but tact and good judgment were exhibited or that discretion with respect to the motion was mistakenly exercised.

The other alleged errors urged by plaintiff to support the claim for a new trial are without substance.

The order of the Appellate Division is reversed and the judgment of the Law Division is reinstated.

WACHENFELD, J., concurring in result.

*For reversal*—Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, BURLING, JACOBS, FRANCIS and PROCTOR—7.

*For affirmance*—None.