86 N.J. Super. 132 (1965)
206 A.2d 185
FRANCES NUSBAUM, PLAINTIFF-APPELLANT,
v.
NEWARK MORNING LEDGER CO., ETC., ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 5, 1964.
Decided January 8, 1965.
*135 Before Judges CONFORD, KILKENNY and LEWIS.
*136 Mr. Harry Green argued the cause for appellant.
Mr. Harold Krieger argued the cause for respondents (Messrs. Krieger, Chodash & Politan, attorneys; Mr. Sheldon A. Weiss, on the brief).
The opinion of the court was delivered by CONFORD, S.J.A.D.
This is an appeal by plaintiff from the grant of summary judgment in favor of defendants in an action for libel. The libel claims arise from a series of news stories and editorials published by the defendant daily newspaper in July and August 1957 growing out of the testimony given by one Wallace before a United States Senate Subcommittee on internal security laws ("Senate Subcommittee," hereinafter) inquiring into the "Scope of Soviet Activities in the United States."
This action was instituted on June 16, 1958. The unfortunate protraction of the proceedings is a story which need not now detain us. Much time was devoted to pretrial discovery and motions. A collateral phase of the matter was dealt with in Nusbaum v. Newark Morning Ledger Co., 33 N.J. 419 (1960). It is of interest that the Supreme Court there, in looking over the complaint and answer, was troubled by an apparent lack of adequate specificity in the pleadings and urged a full and careful pretrial conference to produce a pretrial order as a "specific guide to the ultimate trial" (at p. 427).
In April 1962 former Superior Court Judge Coolahan denied a motion for summary judgment by defendants after consideration of argument and briefs on the ground "that a question of fact exists and under such circumstances the motion for summary judgment must be denied." At a prior pretrial conference the court had granted leave to the parties "to address such motions as they feel are applicable * * * at or before trial." At about the same time the court heard and reserved decision on a motion by plaintiff to strike certain defenses "as an issue to be determined at trial." After Judge *137 Coolahan's resignation in order to accept appointment to the United States District Court bench the case was assigned to another judge for trial. The latter, on October 15, 1962, conducted an extensive conference for further clarification of the issues, and then, over plaintiff's objection, entertained a renewal of defendants' motion for summary judgment, at the same time permitting plaintiff to argue motions for judgment of liability as a matter of law and to strike defenses. The court granted the defendants' motion, denied those of plaintiff and entered final judgment for defendants.

I.
The first issue argued is the alleged impropriety of the entertainment of the motion for summary judgment after a full consideration and denial of the same motion previously by another judge. The court takes the view that the action complained of was within the second judge's discretion for the reason that a party always has a right to apply for reconsideration by a judge of a ruling by him and that since no such motion could be made before Judge Coolahan after his resignation it was appropriate for the judge thereafter assigned to the case to entertain it. TCF Film Corporation v. Gourley, 240 F.2d 711 (3 Cir. 1957); Clarkson v. Kelly, 49 N.J. Super. 10 (App. Div. 1958).

II.
The earlier publications here complained of by plaintiff raise questions, primarily, as to whether the defendant newspaper abused its privilege of publishing a fair and accurate report of a legislative proceeding without malice. That qualified privilege is clearly applicable here. Coleman v. Newark Morning Ledger Co., 29 N.J. 357, 379 (1959); Swede v. Passaic Daily News, 30 N.J. 320, 333 (1959). But the nub of this phase of the case is whether the asserted fairness and accuracy of defendant's reports of Wallace's testimony as adduced before the Senate Subcommittee, and in their defamatory impact on plaintiff, were so unquestionable *138 as to be properly subject to resolution by the court as a matter of law in favor of defendants on motion for summary judgment; or whether reasonable men might fairly differ as to the fairness and accuracy of the reports so as to require the submission of the issues to a trial jury. Ordinarily, "[u]nless only one conclusion can be drawn from the evidence, the determination of the question whether the privilege has been abused is for the jury." Prosser, Torts (2d ed. 1955), § 95, at p. 629; Coleman v. Newark Morning Ledger Co., supra.
We state at once that our careful examination of Wallace's testimony and of the publications complained of, taken against the background of all the material before the trial court, satisfies us that there was no fact issue for trial by jury as to most of the published material impugned which purported to report or be based upon that testimony. But we think there was a proper question for jury resolution as to the fairness and accuracy of those portions of the publications which, in substance or effect, reported Wallace to have testified that plaintiff attended a meeting of the Communist Party or that she was an "intermediary of the Communist Party." Defendants do not deny that such statements were defamatory per se in the concomitant context of the publications, see Mosler v. Whelan, 28 N.J. 397, 405 (1958); Herrmann v. Newark Morning Ledger Co., 48 N.J. Super. 420, 438 (App. Div. 1958), affirmed on rehearing, 49 N.J. Super. 551 (App. Div. 1958), and were actionable unless made under privilege, were true in fact, or constituted fair comment.
A proper resolution of these questions calls for laying the Wallace Senate testimony and the published articles and editorials side by side and comparing them.
Wallace's testimony on the morning of Tuesday, July 23, 1957, is what was reported by the first of the defendant's publications here assailed as libelous  a news article in the defendant newspaper of Wednesday, July 24, 1957 (inaccurately datelined July 25), being the subject matter of the first count of the complaint. The two lead paragraphs of that article read as follows:
*139 "A former Communist told Senate probers today that Newark's three `Fifth Amendment' teachers were present at a party meeting called to try to get Judge John O. Bigelow, a member of the Rutgers board of governors, to lend his prestige to a plan aimed at thwarting the House Un-American Activities Committee's 1954 probe of communism in New Jersey's labor and teaching ranks.
In testimony before the Senate Internal Security subcommittee, William A. Wallace, former high-ranking official of the independent United Electrical Workers Union (UE), said the Communist Party `went after Judge Bigelow as a big shot' in the State Bar Association in an effort to influence other prominent lawyers into defending witnesses before the House Committee." (Emphasis ours)
Thereafter the article purportedly summarized Wallace's testimony of his background as a Communist and union shop steward at Singer Sewing Machine Co. in Elizabeth, as an F.B.I. undercover agent beginning in 1952, and of the presence of three Newark schoolteachers, Laba, Lowenstein and Zimmerman, at the meeting referred to, at the home of a Dr. Tushnet in Maplewood, "called to enlist the aid of Judge Bigelow." The article said that Wallace identified three of the people at the meeting besides himself as Communists  the teacher, Zimmerman, and two other people, a Sylvia Cohen and one Moroze. The article then went on:
"As a result of the meeting, Wallace said a woman was sent to urge Bigelow to make a statement saying it was `perfectly all right for lawyers to defend witnesses in the use of the Fifth Amendment' before the House group.
`We felt that Judge Bigelow (continued on Page 8 Col. 6)

3 TEACHERS NAMED IN SENATE RED QUIZ

(Continued from Page One)
was a big shot.' Wallace said. `And if we could get him to take a position, other lawyers would fall into line  prominent lawyers who carried lots of weight in the community.'
`When we knew the committee was coming into Newark,' Wallace added, `we knew we had to discredit its work. The meeting was called to discuss use of the Fifth Amendment before the committee in order to thwart its purpose, but we knew we would have to get somebody prominent to back us where the Fifth Amendment was concerned.'
Wallace said that he worked as a liason [sic] agent between the union and the Emergency Civil Liberties Committee `to help any *140 Communist teachers who were called to testify before the House Un-American Activities Committee.'"
Plaintiff asserts by way of innuendo that some readers of the foregoing article would identify her as the unnamed "woman" who was supposedly sent to Judge Bigelow at the "1954" meeting (actually 1955) as a Party representative on behalf of the teachers as she was a well-known Newark leader of a movement in defense of the teachers when their prospective summoning by the House UnAmerican Activities Committee was a matter of wide public knowledge. She would have a right at trial to attempt to prove that she was so identified by the public or some of it. See Gnapinsky v. Goldyn, 23 N.J. 243, 252-55 (1957); Garrison v. Newark Call Printing & Pub. Co., 87 N.J.L. 217 (E. & A. 1914). Defendants did not offer proof on the motion for summary judgment negating that fact. It therefore remains a triable issue of fact. The same applies to plaintiff's innuendo that the article is susceptible of the meaning of placing her at the "party meeting."
We turn, then, to Wallace's testimony before the Senate Subcommittee for appraisal and determination as to whether reasonable minds could fairly differ as to the fairness and accuracy (or substantial accuracy; Restatement, Torts, § 611, comment (d)) of the news account's report of that testimony as placing plaintiff (subject to the above) at a Communist Party meeting for the purposes and in the company described.
Notwithstanding plaintiff's argument to the contrary, we find that a printed transcript of the Wallace Senate testimony was before the trial court on the motion.
In the first part of that testimony Wallace traced the history of his activity as a Communist in a party club at the Singer plant, where he was shop steward of the local union; and he told how the party influenced union policy in contract negotiations and in calling strikes during the Korean War to impede the war effort. The Wallace testimony then prefaced and covered the subject matter of this action as follows:
*141 "MR. MORRIS. Now, in connection with your work, Mr. Wallace, did you have any dealings with other groups  people like schoolteachers or lawyers? Communist schoolteachers or Communist lawyers?
MR. WALLACE. Yes. I was a liaison between the union and the front organizations. One of the front organizations  well, I won't say that it is a front organization, but it is not a legitimate organization  was this Emergency Civil Liberties Union.
MR. MORRIS. That is the Emergency Civil Liberties Committee?
MR. WALLACE. Right.
MR. MORRIS, And had no connection whatever with the American Civil Liberties Union?
MR. WALLACE. No. In 1954, I was assigned to work with this committee on exposing  not exposing, but discrediting  the Un-American Committee.
MR. MORRIS. Un-American Activities Committee?
MR. WALLACE. That is right. They were coming in, in July of 1954 to Newark. My job was to coordinate the activities of the union with this committee.
At that time, I met several teachers and professional people  doctors and lawyers  who were also on that committee.
At that time, I found out  well, I can't say that they were Communists  but I found out that they spoke as I did, as far as communism was concerned.
MR. MORRIS. Now, in connection with this hearing, you told us you attended a certain meeting in some doctor's home in Maplewood.
MR. WALLACE. Yes. I attended a meeting at Dr. Tushnet's home.
MR. MORRIS. Was he a Communist?
MR. WALLACE. I can't say that he attended meetings with me, but from the discussions that went on at these meetings, I would say yes.
MR. MORRIS. Who was present at this meeting in Dr. Tushnet's home in Maplewood, N.J.?
MR. WALLACE. There was myself. There was Lew Moroze, M-o-r-o-z-e. He was secretary of the Civil Rights Congress. There was Sylvia Cohen.
MR. MORRIS. Who was Sylvia Cohen?
MR. WALLACE. She was a staff member of my union.
MR. MORRIS. Was she a Communist?
MR. WALLACE. Yes, she was a Communist. She was in the same club as I was.
By the way, that club was the District Club at that time. I was assigned to a new club.
There was Perry Zimmerman. There was Estelle Laba.
MR. MORRIS. Who is Estelle Laba?
MR. WALLACE. She was a schoolteacher.
MR. MORRIS. Is she a Communist?
MR. WALLACE. I never attended a formal party meeting with her but, from the discussion, I would say yes.
MR. MORRIS. Was she one of the witnesses called before the House Un-American Activities Committee?
*142 MR. WALLACE. Yes, she was.
MR. MORRIS. Were there any other schoolteachers called at that time?
MR. WALLACE. Perry Zimmerman. He was called.
MR. MORRIS. He was a teacher?
MR. WALLACE. Yes.
MR. MORRIS. He was present?
MR. WALLACE. Yes.
MR. MORRIS. There was another schoolteacher  Robert Lowenstein. Was he 
MR. WALLACE. Yes.
MR. MORRIS. Was he, to your knowledge, a Communist?
MR. WALLACE. That I don't know.
MR. MORRIS. What happened at this meeting?
MR. WALLACE. Well, there were about nine of us there  nine people. What we were discussing was the fact that we knew the committee was coming.
These people had approached lawyers to act for them before the committee. The lawyers had refused to take part in it and be a part of it. So it was necessary for us to influence these lawyers to defend these people before the committee.
Now, at the same time, we had to raise money for these people to be defended, because the fees were enormous that some of the lawyers were asking, and it was felt that it was necessary to get prominent lawyers  not just ordinary lawyers  prominent lawyers who carried some weight in the community.
So it was felt that Judge Bigelow was  well  he was a wheel. He was a big shot, as far as the bar association in New Jersey was concerned.
MR. MORRIS. What is his first name, do you know?
MR. WALLACE. Offhand, I don't know his first name. I know who he is, though. He was just appointed to the Rutgers board.
Now, if we could get Judge Bigelow to go on record as saying that the lawyers had a right, and the lawyers were perfectly within their right to defend people who felt like using the fifth amendment  if he would come out with that kind of a statement, then certainly we could get prominent lawyers throughout the State of New Jersey who would take these cases. So that was our role.
MR. MORRIS. How did you go about fulfilling that role?
MR. WALLACE. Well, I can't recall the woman's name. There was a prominent woman in Essex County, and her role was to go to Judge Bigelow, since she was on friendly terms with Judge Bigelow 
MR. MORRIS. Was she a Communist, this woman?
MR. WALLACE. I don't know know [sic] her that well, to say she was or was not.
MR. MORRIS. She was generally in sympathy with your work?
MR. WALLACE. Yes. Well, everybody that was there was in sympathy, as far as that was concerned. You know.
*143 So she was to approach Judge Bigelow and try to influence Judge Bigelow to take this kind of position. He did. When he did, we then could approach the other lawyers. They did approach the other lawyers, and got other lawyers. * * *."[1]
It is plainly evident from the foregoing that Wallace at no time identified the meeting at Tushnet's home as a meeting of the Communist Party, although it would be fair to say that the implication is that the Communist Party sent him to participate in it. But there is nothing to indicate that the others (except possibly Cohen) knew that fact. Of the eight or nine people at the meeting Wallace identified four as Communists  himself, Cohen, Laba and Tushnet, the latter two on a "from-the-discussion-I-would-say-yes" basis, although he said that all present were in sympathy "with [his] work."[2] Whether the latter meant in sympathy with getting the teachers legal representation or in Wallace's work as a Communist generally is left unclear in the testimony of the morning of July 23. Wallace did not say that any of those present at the meeting (except, inferentially, Cohen) had ever met with him before or had ever had anything to do with him or his activities for the Communist Party.
It is of course evident that the fairness and accuracy of the July 24 news article as a report of a legislative proceeding, based, as it was, solely on the Wallace Senate testimony given at the July 23 morning session of the Subcommittee, must be determined solely therefrom, and that the legislative session transcript and the news item should each be read as a whole and in context, for this purpose.
The qualified privilege of fair and accurate reporting of a legislative proceeding is of the same character as in the *144 case of reporting judicial proceedings, and the same rules are applicable. Gatley, Libel and Slander (5th ed. 1960), § 488, p. 275. The burden of proof of fairness and accuracy of the report is on the defendant, but this may appear from the plaintiff's evidence. Id., at § 535, p. 299.
"Whether the report is a fair and accurate report is a question of fact for the jury, provided always there is some evidence of unfairness or inaccuracy to go to the jury. This is a question for the judge to determine. Where there is no evidence * * * on which a reasonable jury could find that the report is unfair or inaccurate, e.g., where it is shown * * * to `differ so little that no reasonable jury could say that the difference affected the plaintiff,' the judge should stop the case and direct a verdict for the defendant." Id., at p. 300.
On a motion for dismissal of a complaint for libel at the end of plaintiff's case based on defendant's exercise of the privilege of fair report of a legislative proceeding the proofs and reasonable inferences will be examined in the light most favorable to plaintiff. Swede v. Passaic Daily News, supra (30 N.J., at p. 328). It would seem that these rules should apply even more pointedly when the defendant seeks summary judgment in advance of trial on the assertion of absence of evidence of unfairness or inaccuracy as a matter of law.
Wallace's testimony did not indicate that ail or most of those present at the Tushnet meeting were Communists or that those who were such were necessarily known to the others, or specifically to plaintiff, to be of that genre. Nor is there any indication therein that the initiative for the meeting was not that of the three teachers or their friends rather than that of the infiltrating Communist, Wallace. If a jury could surmise from what Wallace said that the Communist Party arranged for the Tushnet meeting, his testimony is, it seems to us, more readily susceptible of the reading that a group of people, including the embattled Newark teachers, some Communists, others not, got together in the common cause of securing counsel for the teachers to represent them in their impending call before the House Committee.
*145 In addition to the questionable aspect of the July 24 news story in characterizing the Tushnet meeting as a "party" (meaning Communist party) meeting, there are further apparent inaccuracies in that publication in that Wallace did not testify that the "Communist Party went after Judge Bigelow as a big shot, etc."; did not in his testimony identify two of those present, Zimmerman and Moroze, as past or present members of the Communist Party; and did not testify either that the Tushnet meeting was called to "discuss use of the Fifth Amendment before the [House] committee in order to thwart its purpose" or that he (Wallace) "worked as a liason [sic] agent between the union and the Emergency Civil Liberties Committee `to help any Communist teachers who were called to testify before the House * * * Committee.'" All of these recitals in the news story gave added strength and color to the defamatory sting of the story as a whole in attributing to plaintiff (by asserted innuendo) presence at a meeting of the Communist Party on behalf of which Party she undertook a mission to obtain reputable counsel for the teachers.
We are clear that there was evidence of unfairness and inaccuracy in the respects noted above in the news story of July 24 as a purported report of the Wallace Senate testimony of the morning of July 23 and that therefore a disputed fact issue as to the claimed defense of fair and accurate reporting of a legislative proceeding was presented, calling for resolution by a trial jury and precluding grant of summary judgment to defendant on the first count of the complaint.

III.
The second count of the complaint involves a news story and an editorial in the defendant's issue of July 25, 1957. By the time of that publication the defendant paper had information concerning additional testimony which Wallace had given before the Senate Subcommittee on the afternoon of July 23, 1957. The latter information, according to the news story *146 itself, came not from attendance at the afternoon Senate session by any representative of the defendant but from Robert Morris, Senate Committee Counsel (see infra). The July 25 news story dealt primarily with an interrogation of two of the Newark teachers the day before by the House Un-American Activities Committee. It went on to state:
"At the same time, it was learned the Senate Internal Security Committee subcommittee may call a `Frances Nusbaum' identified by former Communist William A. Wallace as a woman sent by a Red Group to persuade former Superior Court Judge John O. Bigelow to represent the teachers."
The story also said: "Wallace testified the decision to recruit Judge Bigelow was made at a Communist meeting in Tushnet's home in Maplewood." The reference to the "Communist meeting" was repeated in the context of a reference to Wallace's testimony that the three Newark teachers under fire had attended that meeting. The subject matter of the July 23 afternoon Senate session was related in the news story as follows: After saying introductorily that "Wallace said a woman had been sent to urge Bigelow to make a statement," etc., the news story went on:
"Morris said Wallace, at a later hearing, said the woman's name was Frances Nusbaum. Morris said Wallace was asked whether he knew the woman to be a Communist.
`No, not to my knowledge,' Morris said Wallace replied. `But I can say definitely she was sympathetic to the Communist Party. And her purpose at that time was to discredit the Committee on Un-American Activities,' * * *." (Emphasis added)
In respect of this July 25 news story plaintiff claims defamation in being placed again (this time by name) at a Communist Party meeting and represented to have been an emissary of a "Red Group" to Judge Bigelow. Defendant, still relying upon the privilege of fair and accurate report of a legislative proceeding, cites the official transcript of Wallace's afternoon testimony on July 23, 1957 before the Senate Subcommittee. This was, in pertinent part, as follows:
*147 "MR. MORRIS. Have you been able to think of the woman who was the intermediary between the Communist Party and Judge Bigelow?
MR. WALLACE. Yes; I have. Her name was Frances Nussbaum [sic].
MR. MORRIS. To your knowledge, was she a Communist Party member?
MR. WALLACE. Not to my knowledge, but I can say definitely she was sympathetic to the Communist Party. And her purpose at that time was to discredit the Committee on Un-American Activities."
Insofar as plaintiff complains of that portion of the news story of July 25 which quoted Morris as in turn quoting Wallace's testimony that she was sympathetic to the Communist Party and had the purpose of discrediting the House Committee, the foregoing transcript of Wallace's testimony is dispositive in defendants' favor. This demonstrates that the publication was in that regard a fair and accurate report of Wallace's testimony. There will be no issue for the jury in that respect at the forthcoming trial.
We have given some thought to the argument that this portion of the news story (i.e., what Morris said Wallace testified) cannot be defended on the basis of privilege of report of a legislative proceeding because it reports not the proceeding directly but what an attendant at the proceeding stated transpired there. Compare Coleman v. Newark Morning Ledger Co., supra; Rogers v. Courier Post Co., 2 N.J. 393, 400 (1949); Hughes v. Washington Daily News Co., 90 U.S. App. D.C. 155, 193 F.2d 922, 923 (1952). We take the view that in these particular circumstances, the same news story having in other respects purported to report the substance of Wallace's testimony directly, the mere interposition in the story of the reference to Morris as the source of the information as to Wallace's July 23 afternoon testimony does not operate to destroy the privilege as to the latter testimony. In substance and effect, the news story was still as a whole reporting the legislative hearing.
But we do think that the nature of the stated circumstances as to how the defendant got the information as to the July 23 afternoon testimony bears upon the fairness and accuracy of *148 the July 25 news story in repeating the report in the July 24 publication which attributed to Wallace a description of the Tushnet gathering as being a meeting of the Communist Party, as well as in laying to Wallace a designation of plaintiff as the emissary to Judge Bigelow of a "Red Group," inferably the participants in the "Communist meeting" mentioned in another portion of the same July 25 article.
Defendant cites the colloquy between Senate Committee Counsel Morris and Wallace at the outset of the afternoon testimony of July 23 on this subject, i.e.,
"MR. MORRIS. Have you been able to think of the woman who was the intermediary between the Communist Party and Judge Bigelow?
MR. WALLACE. Yes; I have. Her name was Frances Nussbaum [sic]."
as conclusive of the fairness and accuracy of the July 25 publication in attributing to Wallace a characterization of the Tushnet meeting as a "Communist meeting" and of plaintiff as an emissary of a "Red Group."
We do not agree. We hold the view that a triable issue of fact as to fairness and accuracy of the news report in those respects still remained. First and foremost, the brief allusion to plaintiff in the afternoon Subcommittee session of July 23 was but the tail to Wallace's substantial, detailed account in his own words of the nature and incidents of the Tushnet meeting and plaintiff's part in it as given in the morning session of that day. An appraisal of the fairness and accuracy of the report in the July 25 publication in relation to plaintiff's claim of defamation must look to the entirety of the July 23 testimony as a whole, not just the short afternoon segment of it, since the said news story purported to be based on the entirety of Wallace's testimony, and all of it bore upon the asserted libel. See Gatley, op. cit., supra, § 514, pp. 288-289; 1 Harper & James, Law of Torts, § 5.24, at p. 432 (1956).
Certainly reasonable men could disagree as to whether it was fair and accurate to characterize Wallace's July 23 testimony as a whole, morning and afternoon, as being to the effect that the Tushnet assemblage was a meeting of the Communist *149 Party because of the afternoon segment of the testimony alone. Further, it is questionable whether Wallace was adopting as his own the characterization in Morris' leading question to him of the "woman," mentioned by Wallace in the morning testimony, as "the intermediary between the Communist Party and Judge Bigelow." The plain purport of the question was to draw Wallace's attention to the identification of the "woman" whose name he had not been able to recall when testifying about her at the morning session, not to adduce testimony by him that the Tushnet meeting was a meeting of the Communist Party or that plaintiff undertook to be an agent of the Party for the indicated purpose. A jury question as to the fairness and accuracy of the attribution by defendants to Wallace of declarations (1) that plaintiff was in effect an attendant at a Communist Party meeting and (2) an instrumentality of that Party, is plainly presented in relation to the July 25 article.
Defendants cite the fact that when plaintiff attended the Senate Subcommittee session on August 27, 1957 she herself took umbrage at Wallace for having said she was an intermediary of the Communist Party. While this may have probative weight at the forthcoming trial on the issue of fairness and accuracy of the publication in that particular regard, it is not conclusive of that issue. Plaintiff could understandably have assumed the most condemnatory interpretation of the Wallace testimony, particularly in the light of the publicity given that interpretation by defendants, when protesting her innocence of the charges against her before the Senate Committee in person. On the other side of the coin, on the factual issue of fairness posed, may be weighed the fact that Morris did not, when reporting to the press the substance of Wallace's July 23 afternoon testimony (as reported in the July 25 news story), say that it included a statement that plaintiff was an intermediary of the Communist Party, particularly in the light of Morris' pains, at the time, to quote the damaging portion of Wallace's testimony verbatim. Moreover, on the issue of fairness, defendant apparently did not have the *150 transcript of the afternoon testimony, and was basing its story only on what Morris told it, which as noted was devoid of the "intermediary" reference. Cf. Hughes v. Washington Daily News Co., supra.

IV.
The editorial in the July 25, 1957 edition of the defendant newspaper cited in the second count of the complaint constituted a discussion of the status of the investigation of the three Newark schoolteachers by the Newark Superintendent of Schools (see Laba v. Newark Board of Education, 23 N.J. 364 (1957); Lowenstein v. Newark Bd. of Education, 35 N.J. 94 (1961); and Zimmerman v. Board of Education of Newark, 38 N.J. 65 (1962), certiorari denied 371 U.S. 956, 83 S.Ct. 508, 9 L.Ed.2d 502 (1963)), and it posed the question, "Who is telling the truth?" in relation to alleged assertions and denials that the Tushnet meeting was called by the Communist Party. As evidence of the truth of that assertion the editorial stated:
"Since the teachers gave their testimony, a witness has come forward to testify before the Senate Security Committee in Washington concerning a meeting characterized by him as a conference called by the Communist Party at which, he says, the three teachers were in attendance. This meeting, according to the Senate committee witness, who is a former Communist who turned FBI informer, plotted the defense of the teachers and maneuvered support in their behalf from the bar association.
Some of those mentioned by the Senate committee witness have spoken up to impune [sic] his veracity, denying that the meeting was actually called by the Communist Party and contending the meeting was a spontaneous gathering not in the interest of the Communist cause." (Emphasis added)
In defense of the claim of libel of plaintiff (by innuendo) in the foregoing characterization of the nature and purposes of the Tushnet meeting, the reliance is upon the defense of fair comment as well as that of report of a legislative proceeding. Preliminarily, we note that nowhere in Wallace's testimony, even that given on the afternoon of July 23, did he "characterize" the Tushnet meeting "as a conference called by the Communist Party."
*151 In addition to other requirements, the defense of fair comment "must be based on facts truly stated." Leers v. Green, 24 N.J. 239, 254 (1957); Rogers v. Courier Post Co., supra (2 N.J., at p. 400). Ordinarily "defendant must prove that the facts on which the comment is founded are true * * *." Gatley, op. cit., supra, § 580, at p. 322. "The defence of fair comment `does not extend to misstatements of fact, however bona fide.'" Id., § 588, at p. 325. Where, as here, the comment is founded upon facts purportedly disclosed by a legislative or judicial proceeding, the defense of fair comment depends upon the fairness and accuracy of the report of the official proceedings, in relation to those facts, as contained in the publication. See Gatley, op. cit., supra, § 530, p. 296.
Since we have already held that the issue of fairness and accuracy of the report of the Wallace testimony in the factual respects noted must be tried, defendant's liability on the July 25, 1957 editorial must go to the jury notwithstanding the defense of fair comment.

V.
Other counts of the complaint cite additional news articles and editorials asserted to be libelous. Certain of these, viz., articles published on July 26 and August 1 and editorials of July 26 and August 9 (all 1957), we find to contain factual allusions to Wallace's testimony as describing the Tushnet meeting as a meeting of the Communist Party, or equivalent language, and placing plaintiff there, expressly or by innuendo. While a newspaper may repeat previously reported facts concerning a legislative proceeding, within the limitations of the privilege, where material background to an unfolding news story, Swede v. Passaic Daily News, supra (30 N.J., at p. 334), yet with respect to these particular publications, as well as those discussed above, we find there is a triable issue of fairness and accuracy of the reports of the legislative proceeding in the defamatory respects noted, for the reasons already set forth.
*152 As to some of the publications, defendant stresses its fairness in that it included therein Mrs. Nusbaum's version of the Tushnet meeting and her role in it. While that circumstance may go to the merits of the defense of fair comment in respect of any particular publication assailed (each of which must stand on its own feet as actionable vel non), or to the matter of malice in any of the publications, it cannot justify the summary judgment here awarded defendant. An actionable defamation in one part of a publication is not immunized by the mere setting forth in another portion thereof or in a different publication of a denial of the defamatory fact by the impugned subject thereof.
Plaintiff complains of an editorial in the July 31 issue of the defendant newspaper which stated, among other things, that Wallace "told a Senate Committee last week that the defense of the teachers had been hatched at a meeting stage-managed by Communists." This we find within the protected ambit of a fair and accurate report of the substance of that part of Wallace's testimony. The paper was entitled to use blunt and colorful language to make its editorial point. And fairness and accuracy in reporting is not necessarily inconsistent with editorial bias concerning the subject matter of the report. Wallace did say that four of those present, including Tushnet, were Communists.
The same applies to the August 27 editorial which referred to "Wallace's account of a conspiratorial pro-Communist meeting called to ensnare the Essex Bar" etc.; to a July 29 news item that Wallace said plaintiff "had been sent by a Communist strategy group to persuade Bigelow" etc.; to an August 5 editorial stating he said that certain plans "were laid at a meeting of Communists and their friends"; and to an August 28 article that he named plaintiff "as the intermediary in a Communist plan to obtain * * * counsel," etc. We find none of these to have transcended the privilege of fair reporting of Wallace's testimony or to present a jury issue in that regard.
*153 The recent decision of the United States Supreme Court in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), although not necessarily a defense to this action (see infra), does, we think, adumbrate a tendency for broader First Amendment protection of publications discussing matters of public concern. See also Pauling v. News Syndicate Company, 335 F.2d 659 (2 Cir. 1964), also discussed further infra; Clark v. Allen, 415 Pa. 484, 204 A.2d 42 (Sup. Ct. 1964). On the basis of the record before us, therefore, we draw the line as to amenability to a jury trial of the fairness and accuracy of defendants' publications between their report of Wallace's testimony to the purported effect that plaintiff attended a meeting of the Communist Party and was an instrumentality of that Party, on the one hand, and the less pinpointed characterizations mentioned in the two next preceding paragraphs of this opinion, on the other. The Rubicon is crossed with the imputation of plaintiff's direct Party involvement.
A majority of the court also finds free from fault a July 30 news item wherein Wallace is quoted as having said the previous day, "to support his recent statements before the Senate * * * Subcommittee," wherein he "implicated" plaintiff: "I am prepared to document every statement I make with dates, names and places of meetings whether it be for the Communist Party or the Communist Party front organizations." The publication as a whole is found by the court not defamatory of plaintiff. The quoted language does not name her. The other contents of the article are either fair comment or fair reporting of the legislative proceeding.[3]

*154 VI.
Plaintiff asserts libel by some of the other news items and editorials published by defendant and cited in the complaint in reporting her appearance and testimony before the Senate Subcommittee, and in giving background material as to such reports, particularly in reference to her position before the Subcommittee as to the justification for retaining Communists as teachers in the Newark public schools (if otherwise qualified and adequately monitored in the classroom). We have carefully considered the testimony of the plaintiff both at the Senate hearing and in pretrial depositions and the content of the publications complained of. We see no need to discuss this material or the contending arguments of the parties in relation thereto in detail. It suffices to say that we are satisfied that all of the publications mentioned in the complaint, in all respects not found in earlier parts of this opinion to have presented jury questions, were within the ambit of the defense of fair comment or the qualified privilege of report of a legislative proceeding and were free in fact of malice in those respects. In particular, we do not find the headlines in the publications to be unfair or distorted, as claimed by plaintiff, except in relation to the portions we have held to be properly referable to a jury.
It may be noted that beginning with the publication of August 24 and through the end of the series on August 28, defendant was careful to avoid characterizing Wallace's testimony as to the Tushnet meeting as concerning a meeting of the Communist Party. This, however, cannot eliminate the factual issues as to defamatory substance and abuse of privilege in relation to the other publications discussed above.
It follows from what we have held in the present and next preceding points of this opinion that the judgment of the trial court is affirmed as to the entirety of the publications complained of which are set forth in the 4th, 5th, 6th, 7th, 9th, 11th, 12th and 13th counts of the complaint.

*155 VII.
Pending this appeal the United States Supreme Court in New York Times Co. v. Sullivan, supra, held that the federal "Constitution limits state power, in a civil action brought by a public official for criticism of his official conduct, to an award of damages for a false statement `made with "actual malice"  that is, with knowledge that it was false or with reckless disregard of whether it was false or not.' 376 U.S., at pp. 279-280 [84 S.Ct., at p. 726]" (as paraphrased by the writer of the opinion, Mr. Justice Brennan, in his opinion in the more recent case of Garrison v. Louisiana, 85 S.Ct. 209 decided November 23, 1964, extending the New York Times rule to state criminal libel cases). Defendants now urge, by supplemental brief, that the spirit of the New York Times decision, as expounded upon in dictum by the United States Court of Appeals for the Second Circuit in Pauling v. News Syndicate Company, supra (335 F.2d, at p. 671), justifies applying the rule of the New York Times case against any "participant in public debate on an issue of grave public concern."
Proceeding on the foregoing premise, defendants argue that plaintiff was a former member of the Board of Education of Newark (up to 1953) and that her voluntary public involvement in the cause of the Newark teachers in 1955 and her voluntary testimony before the Senate Subcommittee in August 1957 should bar any action for defamation by her based upon publications growing out of the controversy over the teachers, absent a showing of actual malice in the New York Times sense of the term. Acceptance of that thesis, legally and factually, would, it is asserted, put the plaintiff out of court as it would then make no difference whether the publications were or were not fair and accurate reports of or fair comment upon the Wallace Senate testimony. However, the issue would still remain, it seems to us, even under the New York Times rule, whether any of the publications found by the jury not to be fair and accurate reports of the testimony *156 were made by defendant with actual knowledge that the Wallace testimony was not as reported, in the particular phases mentioned above, or with reckless disregard of the facts as to the actual content of that testimony. Moreover, a debatable question arises as to whether plaintiff's 1955 activity on behalf of the teachers would, under the rule projected, bar her action for libels so remote as July and August 1957. If her public activity on behalf of the teachers extended to 1957 this record does not clearly so demonstrate, for summary judgment purposes. At best, a jury issue in that regard would apparently be projected. As to the plaintiff's 1957 testimony before the Senate Subcommittee a question would arise as to whether this was not purely defensive, rather than a voluntary entrance into a public debate.
In any case, as an intermediate appellate court, we hesitate at this time and with the case in its present posture here to stake out any further immunities against libel actions beyond those expressly held in New York Times or intimated therein (i.e., actions by public officials or by candidates for public office, see 376 U.S., at pp. 279-282, 84 S.Ct., at p. 710). We have before us no fully tried action, but only a scattered record antecedent to a motion for summary judgment. We deem it the appropriate course at this juncture to permit defendants to apply to the trial court to amend the answer and pretrial order to set forth the newly projected defense, whereupon plaintiff can state her legal and factual position with respect thereto in the amended pretrial order. The new issues can then be disposed of at the trial, along with all others.

VIII.
Plaintiff's appeal from the final judgment brings up for review also the denial therein of her motion for judgment of liability and to strike defenses, and this point is pursued in plaintiff's brief. In view of the other conclusions in this opinion we are required to deal with the asserted errors in those respects.
*157 It is first argued that the answer should have been stricken insofar as truth is pleaded for failure to plead the defense fully and in every particular. Wilson v. Savino, 10 N.J. 11, 16 (1952); Merrey v. Guardian Printing & Pub. Co., 79 N.J.L. 177, 183 (Sup. Ct. 1909), affirmed 81 N.J.L. 632 (E. & A. 1911). However, this general rule is subject to the qualification that the plea of justification (truth) need only cover the main charge or charges or the gist of the asserted libel, not the immaterial portions. Prosser, Torts (2d ed. 1955), § 96, at p. 632; Herrmann v. Newark Morning Ledger Co., supra (48 N.J. Super., at p. 432). Further, the rule of specificity in pleading truth applies only where the defamatory charges are general in nature, Fodor v. Fuchs, 77 N.J.L. 92 (Sup. Ct. 1908), reversed on other grounds, 79 N.J.L. 529 (E. & A. 1910); where the libelous charges are specific a general plea of truth will suffice. Gatley, op. cit., supra (§ 854, p. 471); Herrmann v. Newark Morning Ledger Co., supra (48 N.J. Super., at p. 433).
In the present case the alleged libelous charges were specific but several. The answer could therefore have properly pleaded truth generally, but should have done so separately as to each specific charge of libel. In this regard it may be noted that the call of the Supreme Court in the prior appeal of a collateral phase of this case for more specific statements of claims and defenses by each side, Nusbaum v. Newark Morning Ledger Co., supra (33 N.J., at p. 427), has been heeded, but not in an entirely satisfactory manner. Plaintiff did compact her claims as to each libel and issue asserted from her voluminous complaint to a much more succinct "supplemental pretrial memorandum." This, however, was not incorporated into the subsequent pretrial order, the conference thereon having been held before Judge Coolahan June 26, 1961 and the order signed October 15, 1962, after his resignation, by the judge who later entered summary judgment herein.
The statement of defendants' position in the said pretrial order obviously failed to meet the Supreme Court's enjoinder *158 in the decision cited. However, the intent thereof was sought to be met by an extensive conference in the nature of a supplemental pretrial conference held before the second judge in the case on October 15, 1962 (mentioned at the head of this opinion) wherein the defendants purported to state exactly what defenses, including truth, were intended to be advanced against each charge of libel in the publications. Although there is a lengthy transcript of that conference, the stipulations arrived at were never incorporated into a pretrial order for ready use at the trial by the court and parties. This should obviously be done when the case is pretried again, but limited to the counts remaining for trial. A new and comprehensive pretrial order to supplant the previous ones is called for after any further amendments of the answer such as discussed hereinabove. These steps should be taken and trial held with all reasonable dispatch in view of the inordinate time that this litigation has been pending.
In the light of our conclusions hereinabove, plaintiff was not entitled to a judgment of liability. The case is one for trial by a jury, but confined to the express portions of the publications specified above as libelous and reasonably issuable in fact as to the defenses of fair comment and privilege of reporting legislative proceedings (characterizations of the Tushnet meeting as a meeting of the Communist Party which plaintiff attended and of plaintiff as an intermediary of the Communist Party, or to the same effect), which publications are set forth in the 1st, 2d, 3d, 8th, and 10th counts of the complaint. As to those portions of the said publications the jury will also if necessary pass upon the issues of malice and truth, subject to appropriate instructions by the trial court on the whole case as tried. As to those portions of the said publications the judgment of the trial court is consequently reversed. As to all other portions of the said publications, and as to the entirety of the publications set forth in the 4th, 5th, 6th, 7th, 9th, 11th, 12th and 13th counts of the complaint, the judgment is affirmed.
Modified and remanded for further proceedings in conformance with this opinion. Costs to abide the event.
NOTES
[1] Wallace gave brief additional testimony on the afternoon of the same day, July 23, 1957, in which he named plaintiff as the woman who was sent to Judge Bigelow. It is set forth later in connection with the discussion of the subsequent publications.
[2] One Moroze was identified by Wallace only as secretary of the Civil Rights Congress, but that organization was not otherwise referred to in his testimony.
[3] The writer of this opinion, however, deems the quoted reference, in the context of the whole publication, to be defamatory of plantiff and to raise a fact question as to the fairness and accuracy of the report, if the article is taken as a report of a legislative proceeding, for the same reasons expressed hereinabove as to the published excerpts held by the court to present triable fact issues. It may well be, moreover, that the direct quotation of Wallace in the article is not attended by any privilege since the remarks were not made in a legislative proceeding. The innuendo that the remarks refer to plaintiff seems fairly for a jury.