## GROVE BALDWIN *v.* HILO TRIBUNE-HERALD, LIMITED.

### No. 1988.

ARGUED JUNE 18, 1931.     DECIDED SEPTEMBER 26, 1931.

PERRY, C. J., BANKS AND PARSONS, JJ.

88

OPINION OF THE COURT BY BANKS, J.

This is the second time this case has come here for review. The first time it was brought by the plaintiff on exception to the action of the court below in sustaining the demurrer to the complaint. The exception was sustained and the case was remanded for further proceedings. *Baldwin* v. *Tribune-Herald*, 30 Haw. 610. The trial of the case below on its merits resulted in a verdict in favor of the plaintiff in the sum of $2,650. It is now here on the defendant's exceptions.

The first exception is to the refusal of the trial court to direct a verdict for the defendant. This exception is based on the claim that the truth of the matter contained in the publication was proven by the uncontradicted

evidence. It has too long been the law to be now questioned that the truth of a publication is a defense to an action for libel predicated upon it. *Waterhouse* v. *Spreckels*, 5 Haw. 246; *Gomes* v. *Haw'n Gazette Co.*, 10 Haw. 108; 36 C. J. 1231, § 192. This rule, however, has the following qualifications: "The truth, when relied on, must, to constitute a complete defense, be as broad as the defamatory accusation." 36 C. J. 1233, § 194. The publication upon which this action is based is quoted in full in *Baldwin* v. *Tribune-Herald, supra,* and need not be repeated. By innuendo the plaintiff ascribed to it the following meaning: "Therein and thereby saying and falsely and maliciously designing to have it so understood and believed by the readers of said publication and by the public, that the Baldwins (meaning this plaintiff, Grove Baldwin, referred to as 'Doc,' and his wife, Mrs. Grove Baldwin) gave at their home on the night of November 3, 1927, a drinking and feasting party, which lasted until midnight or later, at which the writer of the published composition above set out was present as a guest; that the said party was wild and boisterous and that the noise of breaking glass harmonized with the noises made there in crunching and devouring crab meat and the noises made by partakers in telling and singing anything that they had heard; that the participants in said boisterous midnight party, which was presided over by plaintiff's wife at his home, became so irresponsibly excited and hilarious from intoxication that it was difficult to remember the next day much of what transpired that night, but that certain sketches stood out in the memory of the author of the composition the following day, namely: that the plaintiff had berated the Hilo Tribune-Herald and said that the Merry-Go-Round was a lotta krat; that the plaintiff demonstrated that he was a good 'mixer,' and for the entertainment of his guests

sang bad poetry and sung it badly; that he has a harsh, irritating voice, is too fat, and appeared before his guests in purple pajamas; that members of the said party given at the home of plaintiff and his wife were entertained with 'nice clean parlor jokes' by Jazz Belknap, who is by said publication said to have been publicly designated a bum, a liar and a thief, and members of the party became so drunk and roisterous that they adopted the pastime of house wrecking, which they continued until 2 o'clock in the morning; that the plaintiff is a 'medicine man' (meaning to describe plaintiff in his profession as a physician) and that in considering this fact the author of the composition shudders in disgust at the thought of doctors, meaning physicians; that, with particular reference to plaintiff and his conduct and capability as a doctor, the profession of doctor of medicine does not require any brains and is a despicable business to be ashamed of; and then this plaintiff is therein deliberately, maliciously and vengefully taunted, following the imputation that his calling requires no brains, with the words, 'Well, how d'yuh like it;' and is further taunted with the words and characters: '(Now suppose you sing to the people! %§$&@??),' thereby meaning that if this plaintiff does not wish to submit in silent shame and suffering to the false report and spiteful and malicious injury done to him by the publication of the above set out scurrilous statements and expletives he can make his complaint to the court and a jury of the people."

In commenting on the publication in connection with the innuendo we said in the former opinion (30 Haw. p. 619): "Much of the language used in the article is ambiguous. It may be reasonably said that it is susceptible of being understood in two senses,—one sense being somewhat crudely humorous and therefore harmless; the other sense being that attributed to it by the innuendo

and therefore injurious. If it was intended to charge the plaintiff and his wife with giving at their home the kind of party described in the innuendo and if it was so understood by those reading the article, it is defamatory *per se.*"

On the issue, therefore, of whether the publication contained a true account of what transpired at the Baldwin home it was necessary, in order to justify a directed verdict in its favor, for the defendant to prove, by uncontradicted evidence, that substantially everything occurred which by the innuendo was pointed out as defamatory, provided it could reasonably be inferred from the publication itself. In other words, the truth of the charge as it is alleged in the innuendo to have been intended by the defendant to be understood, and as it was reasonably susceptible of being understood, must be proven.

We think the evidence does not meet this requirement. William J. Belknap, for instance, one of the defendant's witnesses, speaking of the party itself, testified in substance that about twenty minutes after eleven o'clock on the night mentioned in the publication he, together with three other men, Roberts, White and James, went to the Baldwin home. They found the doors open and entered. The witness, who was on terms of intimacy with Dr. and Mrs. Baldwin, entered the bedroom and found the doctor and his wife in bed. He sat down on the side of the bed and talked to the Baldwins for a few minutes without any objection on their part. At his suggestion both Dr. and Mrs. Baldwin put on their kimonos and went into the living room where the other three men were waiting. White and James, with whom Dr. Baldwin was not acquainted, were introduced and the entire party sat down and talked for a little while then Dr. Baldwin and the witness went out in the kitchen and alcoholic drinks were prepared and brought into the room where they were

served. When asked if this was "a drinking party" or if it was "just simply a few drinks served for the purpose of entertaining the guests," the witness said: "I wouldn't say it was a drinking party; just two or three drinks." After the drinks were brought into the living room there was conversation regarding what the witness and his three companions had been doing before they reached the Baldwin home. The witness danced some and Dr. Baldwin played the piano. Some extemporaneous songs were sung, in which Dr. Baldwin and the witness engaged. The party continued from twenty minutes after eleven until about twenty minutes to twelve, when the witness and his three companions went away. As they were leaving Dr. and Mrs. Baldwin bade them good night and asked them to come again. There was no indication by the Baldwins that the guests were unwelcome. James and White apologized for calling at such a late hour and Mrs. Baldwin by her reply indicated that it was all right.

L. L. Roberts, who was also present at the Baldwin home and who was called as a witness on behalf of the defendant, described the party very much as did Belknap. He was not as certain as Belknap that alcoholic drinks were served, saying in that regard that he did not remember what the character of the drinks was. He "imagined" that they all had two or three drinks. Baldwin played the piano and he and Belknap sang a few songs. He did not recollect that anything occurred when he and Belknap and the other two men left except the Baldwins' bidding them good night. He thought the party lasted about twenty minutes.

The testimony of Dr. and Mrs. Baldwin relating to the nature of the party was not materially different from that of Belknap and Roberts except that Mrs. Baldwin testified that no drinks were served and Dr. Baldwin testified that Belknap, Roberts, White and James were

under the influence of liquor when they arrived but seemed less intoxicated when they left.

The testimony of these witnesses portrays a very different sort of entertainment from the boisterous and unseemly one which, according to the innuendo, was inferable from the published article. Indeed, if the publication had described what occurred, as it was described by the witnesses, the plaintiff would have had no cause of action.

The next exception which we will notice relates to the refusal of the court below to give the following instruction requested by the defendant: "You are instructed that the article published by the defendant in this case does not impute to the plaintiff the commission of any crime." The publication does not impute to the plaintiff the commission of a crime and the jury should have been so instructed. This was necessary for the reason that by the innuendo it is alleged that it was the design of the defendant in publishing the article to charge the plaintiff and his wife with having given a party at their home at which those present became drunk. A jury of laymen, unacquainted with the law, might easily infer that the plaintiff was charged with a violation of the National Prohibition Act and therefore was charged with the commission of a crime. Such an inference would be unwarranted and the jury should have been so instructed.

The next exception we will notice relates to the refusal of the court below to give the following instruction requested by the defendant: "The article in question uses the following words: 'One thing for the Doc, however, he's a first-class mixer.' You are instructed that according to the pleadings in this case you are not entitled to consider the word 'mixer' to in any manner refer to the occupation of a bar-keeper." It appears from the record that plaintiff's counsel, against the objection

of the defendant and with the approval of the court, argued to the jury that the portion of the article referred to might be taken to mean that the plaintiff was a "mixologist." The defendant's objection to this argument was that the plaintiff's innuendo did not ascribe to the word "mixer," as it was used in the publication, the meaning of mixologist, and therefore it was improper and prejudicial to urge upon the jury that it should be so interpreted. Webster's New International Dictionary defines "mixer" as "a person who mixes things; as: (1) A workman who performs such an operation in some manufacturing process. (2) A bar tender. * * * A person who has social intercourse with others of many sorts; a person viewed as to his casual sociability;—commonly used with some characterizing adjective; as, a good *mixer;* a bad *mixer."* There is nothing in the innuendo which ascribes to that sentence in the publication, in which it is said of the plaintiff that "he's a first-class mixer," a defamatory meaning, such as that he is a first-class "bar tender," or any equivalent term. In the absence of such an innuendo the expression is conclusively presumed to have been used in its harmless sense and it was improper for plaintiff's counsel to ask the jury to ascribe to it a different meaning, which might be considered injurious to the plaintiff, and it was error to permit him to do so. It is true that the word "mixologist" has no standardized definition. It is, however, a colloquialism which is commonly understood to mean one who habitually mixes intoxicating drinks. Under the pleadings the jury had no right to so construe the term that was used in the publication or to place upon it any similar construction and should therefore in some way have been so informed by the court. It cannot be said that the argument which plaintiff's counsel was permitted to make was without influence upon the jury. It was evidently intended to

persuade that body to reach a verdict favorable to the plaintiff, otherwise there was no point in making it. It must be assumed, therefore, that it had its intended effect.

The next exception we will notice relates to the allowance by the court below, against the defendant's objection, of evidence that the plaintiff was forced by the published article to leave the community in which he resided and remove with his family to the mainland of the United States. The ground of this exception is that such evidence tended to prove special, as contradistinguished from general, damages and was therefore, under the pleadings, improperly admitted. In this connection the defendant also requested that the following instruction be given, which request was refused: "You are instructed that plaintiff has attempted to put in evidence an alleged fact that he was so injured by the article in question that he was obliged to leave the community and seek a home elsewhere. You are instructed that even if you should find such fact to be true you are not permitted to consider that fact." It cannot be gainsaid, of course, that where only general damages in a suit for libel are claimed, as in the instant case, evidence of special damage should not be received. The question therefore is whether the fact, if it was such, that the plaintiff was obliged because of the article to give up his residence in Hilo and go elsewhere to practice his profession, was an item of special damages or whether it was merely a fact tending to strengthen the legal presumption of injury from a publication that may be libelous *per se.*

In *McDuff* v. *Journal Co.,* 84 Mich. 1, 3, 4, the plaintiff was asked the following questions, under objection: "Q Has there been any difference whatever in the treatment since the publication of these articles by any of your acquaintances from what there was before? * * * Will

you tell us in what the difference consisted?" This testimony was objected to for two reasons, one of them being because it involved special damages not alleged in the declaration. In holding that this objection was well taken the court said: "The allegation of damages in the declaration is as follows: 'He, the said plaintiff, has been and is greatly injured in his good name, fame, credit, and reputation, both as an individual and as such trustee, and brought into public scandal and disgrace, is suspected to have been guilty of the misconduct charged upon and imputed to him as aforesaid, and has been greatly vexed, harassed, oppressed, and impoverished, and hath been and is otherwise much injured.' No special damages are alleged; only general damages, in the general and usual language of declarations in libel cases. The article is libelous *per se* but that of itself does not render evidence of special damages, or of specific acts of others towards plaintiff in consequence of the publication, admissible, unless alleged in the declaration. Whenever a plaintiff alleges no special damages, he is presumed to rest content with those damages which are the natural result of the libelous publication upon his character and reputation and feelings, without proof of specific facts. He is presumed to have a good reputation and character. The damages he is entitled to recover are the result of the natural injury to these and to his feelings, coupled with the malice, or want of malice, with which the article was published. These the defendant is prepared to meet. He cannot be prepared to meet special instances of slight, avoidance, loss of hospitality on the part of friends and acquaintances, from whatever part of the world the plaintiff may choose to bring witnesses or to testify himself. If plaintiff desires to recover for damages for such special injuries, he must allege them."

In *Kentucky Journal Publishing Co.* v. *Brock,* 140

Ky. 373, 374, the plaintiff was allowed, against objection, to give testimony tending to show that because of the published article upon which his suit for libel was predicated he lost a certain insurance agency. The Kentucky court in holding that this was error said: "There was no allegation in the petition of special damages. If Brock by reason of the publication suffered any special damages such as the loss of his agency for the insurance company, this should have been pleaded and in the absence of an allegation of special damages the evidence should not have been admitted." There are many cases from other courts laying down the same rule.

A contrary view seems to have been entertained by the Missouri court of appeals in *Gold* v. *Jewelry Co.,* 165 Mo. App. 154, 161, 163, where the court said: "It is urged that the court erred in admitting, over appellants' objection, evidence of special damages to the business of respondent, the petition not pleading damages of such character. The testimony referred to as meeting this assignment is that a witness for plaintiff, testifying, was asked what he had done after reading these publications. To which he answered that he quit selling plaintiff goods; that he had some more goods but did not want to sell plaintiff any more. Plaintiff had about $1500 of goods on hand to sell for this witness and the witness made him give them back to him. Witness was asked if these publications in the paper destroyed his confidence in plaintiff. This was objected to as suggestive. The court admonished counsel not to lead him, whereupon counsel for plaintiff asked the witness if it was after reading these advertisements he had made plaintiff give back the diamonds he had left with him and the witness answered, 'Yes.' This is the only evidence that is pretended to sustain this assignment of error." After commenting on the formal insufficiency of the defendant's objection the

court said: "Passing that, however, we are not persuaded that the admission of this testimony, and this is the only testimony of like character, was error. The case at bar presents a cause of action maintainable without proof of any special damages. If false and published maliciously, the publications were libelous (Revised Statutes 1909, section 4818), and special damages need not be proven. But even in such cases, Mr. Newell in his work on Slander and Libel (2 Ed.), at page 864, section 36, states this to be the rule: 'Where it is clear that the action lies without proof of any special damage, any loss or injury which the plaintiff has sustained in consequence of defendant's words, even after action brought, may be proved to support the legal presumption, and to show from what has actually occurred how injurious and mischievous the words were.' So, also, Odgers on Libel & Slander (4 Ed.), page 308, states the rule. Over and above these rules, however, whatever error there may have been in the introduction to this single piece of testimony as to the loss of business, we hold that it was entirely cured by the action of the learned trial judge in the instruction which he gave at the instance of defendants, to the effect that if the jury found a verdict for plaintiff, they 'cannot assess any damages by reason of any loss or damage to plaintiff's business.' "

The decision in this case on the point under consideration is not a very convincing precedent. In the first place, it is out of harmony with the general rule, and in the second place, in view of the insufficiency of the objection as pointed out by the court and the effect of the instruction given at the request of the defendant, what was said about the admissibility of the evidence was purely dictum.

The plaintiff calls our attention to several cases which he claims support the view that the evidence under con-

sideration was admissible under an allegation of general damages. Three of these cases are from the supreme court of California, only one of which (*Turner* v. *Hearst,* 115 Cal. 394) has any relation whatever to the question. At page 399 of the opinion in that case the court said: "It was not error for the court to allow proof of the extent of plaintiff's practice. Plaintiff was a lawyer engaged in the practice of his profession. The words of the publication being admittedly libelous *per se,* and affecting plaintiff's standing in his profession, it was proper for the jury, in estimating the general damages to which plaintiff was thus entitled, to know his position and standing in society, and the nature and extent of his professional practice. General damages, in an action where the words are libelous *per se,* are such as compensate for the natural and probable consequences of the libel, and certainly a natural and probable consequence of such a charge against a lawyer would be to injure him in his professional standing and practice." In *Burt* v. *McBain,* 29 Mich. 260, 263, which was a case of slander, the court said: "Another error assigned is, that plaintiff was permitted, although the declaration did not claim special damages, to show that in consequence of the slander she was excluded from the society in which she formerly moved, and was affected in mind and health. But these results are the natural, and we might almost say the inevitable results of such a slander of a virtuous young woman, and they might be shown without setting them out in the declaration." The rule laid down in these cases does not go to the extent of authorizing proof of a specific injury, such as the necessity arising out of the published article of the plaintiff's changing his place of residence. There is no presumption of law that such a result would naturally and probably follow the publication in question even though the jury should consider it libelous *per se.*

If therefore the plaintiff wished to predicate a claim of damages upon it, it was necessary before proof of it could properly be allowed to allege it in the complaint.

The next question we will consider arises out of the refusal of the court to give two instructions requested by the defendant. The first of these instructions is as follows: "In considering the issues in this case it is necessary for you to consider the issue of whether the article as published by the defendant was capable of injuring the plaintiff in his reputation. If you so find then you must consider whether it was so intended, and if you do not so find then you must return a verdict for the defendant." The second is as follows: "You are instructed that in considering the issues in this case you must first find that the article as published by the defendant was actually understood in a defamatory sense by persons residing in the community and failing to find such issue, you are to return a verdict for the defendant."

The first of these instructions was properly refused for the obvious reason that by it the jurors were told that their verdict must be for the defendant unless they found that the published article was capable of injuring the plaintiff. This was not an issue of fact to be determined by the jury but was an issue of law to be determined by the court. In the former opinion of this court it was held that the article was ambiguous and was susceptible of being understood in either of two senses—one defamatory and the other harmless—and that because of this ambiguity it was a question for the jury to decide which of the two meanings should be ascribed to it. This conclusion clearly eliminated from the consideration of the jury the issue of whether the article was susceptible of the defamatory meaning attributed to it by the innuendo and therefore of being injurious to the plaintiff. If the jury reached the conclusion that the article in fact was

meant in a defamatory sense, and was so understood then it was libelous *per se* and its injurious effect would be presumed.

The jurors were also told in this instruction that there could be no verdict for plaintiff unless they found that defendant intended by the publication of the article to injure plaintiff. This is not the law. In an action for libel, if the article complained of is defamatory *per se* (and such would be its character if the jury found that it was meant and understood in a defamatory sense), it is no defense that there was no intention to injure the plaintiff. The intent would be conclusively presumed from the defamation. The law presumes every person to intend the injury his acts are reasonably calculated to produce, leaving the jury to determine the extent of the injury.

In the second instruction the defendant requested that the jurors be told that the plaintiff could recover nothing of the defendant unless they found that the article was actually understood in a defamatory sense by persons residing in the community. This instruction should have been given. Unless the article was understood by its readers to convey a meaning that was injurious to the plaintiff it was innocuous and there could be no recovery of damages on account of it. Whether it was so understood was a question of fact to be determined by the jury. It is contended by the defendant that there was no evidence upon which the jury could predicate such a conclusion. This contention cannot be sustained for the reason that the plaintiff himself on direct examination gave the following testimony: "Q After the publication of the article in the Hilo Tribune-Herald in the Merry-Go-Round column you complain of in your complaint, did you observe any difference in the attitude of the people towards you?" "A I did. Q What, if any, was

that difference?" "A They regarded me with suspicion and amusement." "Q Do you know whether or not you were pointed at as you passed on the street those who knew you and remarks made about you?" "A I was chided and made fun of by everyone even to the Japanese. * * * And most everyone I met asked me if I had a good time at the wild party at my house." "Q The people that you met and spoke to you about this and referring to the wild party at your house referred to the party described in the article in the Merry-Go-Round in the Tribune-Herald, did they?" "A They stated that they had seen by the paper that I had this wild party. Q Doctor, can you give any of the names of any people who mentioned this to you? A Roy Blackshear, Harry Wessel, both of the Hilo drug store; all the officers of the Elks' Lodge, including Frank Carr, John Cannon, Mr. Padgett, and my next-door neighbor, Judge H. C. Davies."

This testimony certainly tended to show that at least some of the readers of the article had placed upon it the meaning ascribed to it by the innuendo. The plaintiff having introduced this evidence it is unnecessary for us to decide whether under the law he was required to do so in order to prove his case or whether the jury, in the absence of such evidence, could itself draw the inference from an examination of the article and a consideration of all the facts and circumstances connected with its publication. There is conflict of judicial opinion on this subject.

The next exceptions we will notice are those which relate to the action of the court below in overruling the defendant's motion to suppress certain interrogatories that were propounded to the plaintiff and his wife and the answers to these interrogatories. For the most part the ground of the motion was that the interrogatories were leading. In commenting on the action of the court

below counsel for the defendant say in their brief: "We realize that this court will not reverse a judgment otherwise apparently well founded in law and fact merely because the court has permitted counsel to ask leading questions. We admit that the rule is such that the trial court is allowed a large amount of latitude in the trial of a cause. We insist, however, that the record in this case displays such a flagrant violation of the rules governing the admission of testimony that we can be said to have been prejudiced in the trial thereof." We have read the depositions of the plaintiff and his wife with considerable care and while it is true many leading questions are propounded we cannot say that it was error to overrule the defendant's motion.

The last exceptions which we deem it necessary to discuss are those which relate to the giving of the following instructions at the plaintiff's request: "You are further charged that if you find that the plaintiff is entitled to recover damages, you are not confined to the general damages which you may allow the plaintiff according to the instructions given you, but you may, in addition thereto, assess against the defendant, by way of punishment to it and as an example to others, such damage as you in your sound judgment, under all of the evidence in the case, believe the defendant ought to pay, not exceeding in any event the amount claimed by the plaintiff in his complaint; provided you believe, from the evidence, that the article is defamatory of the plaintiff and was published with actual malice, as distinguished from implied or presumed malice, or published in wanton or reckless disregard of the plaintiff's rights;" and "In determining the question of actual malice, wantonness or recklessness as bearing upon the plaintiff's claim for punitive damages, the nature and substance of the article published, whether or not it was a part of the defendant's

regular course of business to publish articles of that general nature purporting to be news or fact, and whether or not the defendant was, through its employees who were entrusted to make up its publications, apprised of, or was in a position by reasonable effort, to ascertain the true state of affairs with respect to the truth or falsity of the matters published concerning the plaintiff. If you find that the matter published of the plaintiff was defamatory and libelous and that the defendant, through its responsible employees knew it to be untrue, or should and could by reasonable diligence have so known, then this would be evidence of actual malice;" and also to the refusal of the court to give the following instruction requested by the defendant: "You are instructed that you shall not under any circumstances in this case consider the question of punitive damages."

It is contended by the defendant that the giving of the two instructions requested by plaintiff and the refusal to give the instruction requested by it was error for two reasons, first, that there is no claim in the complaint of punitive damages, and second, that there was no evidence upon which punitive damages could be awarded.

The first of these reasons is not sound. It is alleged in the complaint that "at Hilo aforesaid on the 4th day of November, 1927, the defendant, Hilo Tribune-Herald, Limited, vindictively and maliciously and for the vicious and wicked purpose of injuring and defaming the reputation, good name, profession and business of this plaintiff, and with intent to bring this plaintiff into public scandal, unsavory notoriety, disgrace, abhorrence, odium, hatred, contempt and ridicule among the people of Hilo aforesaid and elsewhere wherever the said 'Hilo Tribune-Herald' is circulated and with whom plaintiff was or might become in anywise known, and for the purpose of causing plaintiff to be excluded from the society, intercourse and

patronage, present and future, of divers good and worthy persons at Hilo aforesaid and elsewhere in the world, and with the intent revengefully, maliciously and designedly to injure and defame this plaintiff in his profession, professional standing and business aforesaid, and to injure and destroy his good name and respectability and cause him to be shunned by a large number of good persons and to cause him to suffer shame, humiliation, mortification, annoyance and great mental anguish, distress and vexation, did compose and publish or cause or procure to be composed and published in said 'Hilo Tribune-Herald,' of and concerning this plaintiff, certain and several false, libellous and defamatory words, matters and things in a composition, as follows:"

These averments charged that the article was published with the malicious and vindictive intent to injure the plaintiff in his professional and social standing. A case for punitive as well as general damages was therefore presented. In *Dwyer* v. *Libert*, 30 Idaho 576, 586, the court said: "In the instant case the allegations of the complaint would justify the jury in bringing in a verdict, not only for compensatory damages but also for exemplary damages. The complaint alleges that the charges were false and malicious, and published by the defendant with the deliberate purpose and intention of injuring the defendant in his good name and reputation and causing his dismissal as said patrolman of said city of Lewiston, Idaho." There is no more reason for requiring a specific claim for punitive damages in a complaint based on a libelous publication than in a complaint based on any other kind of tort. In *Stark* v. *Epler*, 59 Ore. 262, 267, which was an action for damages arising out of assault and battery, the court said: "The rules of pleading do not require that the allegations relating to exemplary damages should be set out separately from the

other averments of the complaint. Special damages must be grounded upon separate allegations, but exemplary damages are so intimately connected with general damages that if the general allegations are sufficient to show the wrong complained of was inflicted with malice or oppression or other like circumstances, the complaint will be sufficient to authorize the infliction of punitive or exemplary damages." In *Nashville, C. & St. L. Ry.* v. *Blackmon,* 7 Ala. App. 530, which was an action for damages brought by a passenger alleged to have been carried in a baggage car against her will and over her protest, the court said in the syllabus: "Where the complaint describes an act justifying the imposition of punitive damages, it is not necessary to the recovery of such damages that they should be specially claimed in the complaint." The same rule is laid down in many other cases.

It remains to be considered whether the evidence of malice was sufficient to justify the imposition of this character of damages.

In *Kahanamoku* v. *Advertiser,* 26 Haw. 500, 503, this court said: "When punitive damages are permitted to be added" (to actual damages) "by the jury they are allowed purely upon the theory that the person or other entity against whom the verdict is rendered was actuated by actual, as distinguished from legal, malice; that he ought to be punished therefor; and that the community should be protected by discouraging a repetition by him or by others of such publications so actuated. The proceeding becomes to this extent somewhat criminal in its nature. So understanding the theory of punitive damages, they should not be awarded against one, whether a corporation or an individual, who was not himself moved by actual malice and who, although adopting an article as his own, had no knowledge of the hatred or ill-will entertained by

the writer. Such punishment should be visited, if at all, upon the writer alone who entertained the malice. The following authorities support the view here adopted: * * * "

This is clearly a holding that punitive damages are not recoverable in an action for libel in the absence of evidence of actual as distinguished from legal malice. The uncontradicted evidence in the instant case shows that Robert P. White was a guest in the Baldwin home on the night of November 3; that he was the author of the article in question which was published on November 4, and that at that time he was the acting editor of the Hilo Tribune-Herald. There is nothing in the evidence which tends to prove that prior to the night of the party at the Baldwin home there was any personal animosity between White and Dr. Baldwin or that anything transpired on that occasion to engender such feeling. On the contrary the evidence shows that White and Baldwin were either entire strangers to each other or had met on only one other occasion.

It is contended by the plaintiff that if White, who knew what occurred at the Baldwin home, in the composition of the article willfully and intentionally materially distorted the truth and wrote and had published an article that was untrue and defamatory, it is sufficient to justify the conclusion that White was actuated by actual malice towards the plaintiff. Assuming this contention to be legally sound, the question nevertheless remains whether White's malice was imputable to the defendant.

In the *Kahanamoku* case, *supra,* one of the exceptions was "that evidence of the actual malice of the writer of the article in question was erroneously excluded." The exception was overruled. The evidence which was held to have been properly excluded was that the article was

written by one Withington, who was at the time a reporter of sporting news and editor of the sporting page in which the article in question appeared, and that he entertained towards the plaintiff a feeling of hatred and ill will and that in writing the article he was actuated by this feeling. It was held by the court that Withington, not being an officer of the corporation and there being no evidence that any of the officers or even the editor in chief had any knowledge of Withington's animosity, his actual malice towards the plaintiff, if he had such, was not imputable to the defendant.

In the instant case there is no evidence that White was an officer of the defendant corporation or that any of its officers had notice that the published account of what occurred at the Baldwin home was not a true account. Plaintiff contends, however, that White was the editor in chief of the defendant's newspaper and therefore his knowledge was in law the knowledge of his principal. The only evidence of White's connection with the defendant corporation is contained in the testimony of Frank J. Cody, the business manager, who was called as a witness by the plaintiff. He testified that on November 4, 1927, Mr. Robert White was acting editor of the Tribune-Herald. He also testified that White originated and conducted that section of the paper known as the "Merry-Go-Round," in which the article in question appeared. There is no evidence of the scope of White's duties as acting editor or the extent of his authority. It cannot be assumed from the mere fact that he held that position that he was authorized, without any limitation, to publish whatever he chose to write without consultation with any one higher in authority. In the absence of such plenary power his ill will towards the plaintiff, inferable from the composition and publication of a consciously untrue account of what transpired at the Baldwin home,

and which might be considered by the reading public as defamatory, was no more imputable to the defendant than was the asserted feeling of Withington, who was the author of the article in the *Kahanamoku* case, and who was also the editor of the page of the Advertiser on which the article in that case appeared.

The errors committed by the court below are indicated in the foregoing opinion and the exceptions presenting those errors are sustained. The other exceptions are without merit and are overruled.

The verdict of the jury is set aside and a new trial granted.

*D. E. Metzger* (also on the brief) for plaintiff.

*C. W. Carlsmith* and *H. L. Wrenn* (*C. S. Carlsmith, C. W. Carlsmith, M. L. Carlsmith* and *Prosser, Anderson, Marx & Wrenn* on the briefs) for defendant.

