EMMETT CAHILL, et al., Plaintiffs-Appellants *v.* HAWAIIAN PARADISE PARK CORPORATION, a Hawaiian corporation, et al., Defendants-Appellees

NO. 5612

DECEMBER 16, 1975

RICHARDSON, C.J., KOBAYASHI, OGATA, MENOR and KIDWELL, JJ.

OPINION OF THE COURT BY KIDWELL, J.

Emmett Cahill, his wife and his three children brought this action against Hawaiian Paradise Park Corporation, the owner and operator of radio station KTRG, David Watumull, its president, and Donald P. Dickinson, its manager, claiming defamation by certain radio broadcasts. The circuit court granted summary judgment for the defendants, under the First Amendment of the United States Constitution and Article I, Section 3 of the Constitution of the State of Hawaii, upon finding "that there is no evidence that any of the state-

524

ments in issue were uttered either with knowledge of any possible falsity or with reckless disregard of their truth or falsity''. Plaintiffs appealed. We reverse the summary judgment as to the corporation and defendant Dickinson.

Radio station KTRG is located in Honolulu. The broadcast of which plaintiffs complain occurred on May 24, 1970. It is admitted that defendant Dickinson, then employed as station manager and talk show moderator on KTRG, read the allegedly defamatory statement in the course of a broadcast on that date dealing with a speech made on May 21, 1970 by the Mayor of Honolulu deploring light sentences for convicted criminals and also dealing with an alleged public statement by plaintiff Emmett Cahill on May 22, 1970 disagreeing with the policies advocated by the Mayor.[1]

---

[1] The text of the broadcast was as follows:

Commentator Donald P. Dickinson: "First, the background, as we know it of Mr. Emmett Cahill, President of the John Howard Association. On the 9th of June, 1969, I, on interim this program, gave the following statement, and I'd like to repeat it for you, if I may:

Music — Female Voice: "I'm a KTRG Listener. I like to keep informed. That's why I listen to KTRG, Honolulu, Hawaii, U.S.A. everyday."

Music.

Donald P. Dickinson: "The statement is as follows:

"Ladies and Gentlemen: In line with our many discussions about the California Grape Boycott controversy, I'd like to bring you a capsule review of the activities of the boycott's local co-chairman, Mr. Emmett Cahill. An article from the Honolulu Star-Bulletin of August 6, 1968 regarding Cahill's resignation from the Hawaiian Telephone Co. is the best over-all public source of information on this man and his family. A significant comment on his decision to quit a respectable job, at the age of 54, is seen in the 3rd and 4th columns of this story under the subheading: 'Family Influenced Him'.

"According from the story, Cahill's decision to quit was not the sole result of his individual fight with his conscience. A family man of the old-fashion variety, Cahill's decision was greatly influenced by his family's words and deeds.

"As it be noted in this story which includes a sub-item headed: 'Cahill's daughter thinks they agree on their goals.' The entire Cahill Family leans far to the left, from the general Peace in Viet Nam movement to the Communist Anarchists Students for Democratic Society, S.D.S., of which daughter, Winifred has been an active member. She has also affiliated herself with such communist-dominated and penetrated groups as the Janet Rankin Brigade, Hawaii Women for Peace, and Clergy & Laymen Concerned About Viet Nam. Her comment on her father evaluating him as a revolutionary in his own way, that is her quote by the way, is interesting. His wife, Bernice, was also a sponsor of the Rankin Brigade and very active in Hawaii Women for Peace, cited as an activist group by the Hawaii Commission on Subversive Activities, particularly as one of

The complaint alleges that by this statement defendants published that each of the plaintiffs was a person who associated only with Communists and conveyed the idea that each of them was disloyal to his country, and was a Communist or a Communist sympathizer. It is also alleged that in a continuance of the broadcast, on the same date, the defendants used innuendo, suggestion of guilt by association and "express and implied language" to convince the radio audience that all of the plaintiffs were Communists and subversives who were engaged in subversive activities aimed at the overthrow of the Government of the United States. The text of the continuance of the broadcast is contained in defendant's affidavits and is not controverted. In it further descriptive material pertaining to the "Rankin brigade" is set forth, including allegations that "well-known identified Communists" were among its sponsors both on the mainland and in Hawaii. In his concluding statement defendant Dickinson said: "That ladies and gentlemen is the Emmett Cahill matter as it stands to date."

five leaders of a Local Tax Payers Against War Committee which included May Lee, wife of Marxist Professor, Oliver M. Lee.

"Son, Jerry Cahill, mentioned in the 4th column of the Star-Bulletin news article as having become a 'Hippy' in California, was a chronic demonstrator in Anti-Viet Nam protest while at the University of Hawaii and as of November, 1966, was mentioned in the local press as heading the Student Partisan Alliance, which later, under faculty advisor, Oliver Lee, issued the infamous manifesto calling for murder and sabotage within our Armed Forces in South Viet Nam.

"Emmett Cahill himself, has not received as much activist publicity as his wife and children, although his desires for a surrender-peace by the United States in Viet Nam are known through his affiliation with Business Executives Move for Viet Nam Peace and Hawaii Veterans for Peace in Viet Nam, cited as activists group by the Hawaii Commission on Subversive Activity. He has also signed resolutions for peace sponsored by Clergy & Laymen Concerned About Viet Nam. Politically, he was a leading supporter of Eugene McCarthy for President. A side light of additional interest is that Emmett Cahill on April 30th, 1969, was among a group which testified at a house hearing on marijuana, House Bill 1193, to change the status of marijuana possession from a felony to a misdemeanor. Cahill testified for the bill along with the controversial Reverend Gene Bridges. He is currently co-chairman of Hawaii Table Grape Boycott Committee which includes several identified communists: Harry Epstein, Steven Murin, Jean S. King.

"Thus, there is the man. You all know the issue. Think it through.

"End Statement.

"That was the statement I read concerning the activities of Mr. Emmett Cahill and his family on the 9th of June, 1969."

I

We first consider the issue of defendant David Watumull's liability separately from the liability of the other defendants. Defendant Watumull was not shown to be involved in the broadcast otherwise than as might be implied from his status as a shareholder and president of defendant Hawaiian Paradise Park Corporation. The law is firmly established that officers, directors or shareholders of a corporation are not personally liable for the tortious conduct of the corporation or its other agents, unless there can be found some active or passive participation in such wrongful conduct by such persons. *Rohauer v. Killiam Shows, Inc.*, 379 F. Supp. 723, 729 (S.D.N.Y. 1974); *Hagemeyer Chemical Co. v. Insect-O-Lite Co.*, 291 F.2d 696 (6th Cir. 1961); 46 A.L.R. 3d 428, *Disregarding Corporate Entity;* 18 Am. Jur. 2d, *Corporations,* §§ 13, 14; 19 Am. Jur. 2d, *Corporations,* §§ 713, 714. We find no evidence in the record from which a finding could be made that defendant Watumull participated in the broadcast complained of. There is nothing to suggest that this is a case in which the corporate entity should be disregarded because of circumstances that reveal that the shareholders treated and regarded the corporation as their alter ego. *Cf., Kahili, Inc. v. Yamamoto,* 54 Haw. 267, 506 P.2d 9 (1973). Accordingly, the summary judgment in favor of defendant Watumull is affirmed.

II

The remainder of this opinion concerns itself with the liability of defendant Hawaiian Paradise Park Corporation, which is the owner and operator of KTRG radio station, and of defendant Dickinson, who was the station manager and the moderator who read the allegedly defamatory statement. The circuit court rested its decision solely upon the existence of constitutional protections against the claims of all of the plaintiffs. We will first view the case without regard to defendants' constitutional protections, and then consider how far the constitutional protections are applicable.

Defendants assert that the case may be disposed of without reaching the constitutional issue, contending that there was no actionable defamation in the broadcast complained of. They contend that, while certain persons were referred to as Communists and certain organizations were stated to be Communist, anarchist or Communist-penetrated or dominated, none of the plaintiffs were referred to directly as Communists, Communist sympathizers, or otherwise characterized except as leaning "far to the left". They argue that the words used were not capable of a defamatory interpretation.

Plaintiffs seek by innuendo to place upon the broadcast the meaning that plaintiffs are Communists or Communist sympathizers. Where the statement is not constitutionally protected it is generally held, and we agree, that publication of a false charge that an individual is a Communist or a Communist sympathizer is libelous per se. *MacLeod v. Tribune Publishing Co.*, 52 Cal. 2d 536, 343 P.2d 36 (1959); *Weisberger v. Condon*, 161 N.Y.S.2d 448 (1957); *Grant v. Reader's Digest Ass'n*, 151 F.2d 733 (2d Cir. 1945), *cert. den.* 326 U.S. 797; *Matson v. Margiotti*, 371 Pa. 188, 88 A.2d 892 (1952); *Burrell v. Moran*, 38 Ohio Op. 185, 82 N.E.2d 334 (1948); *Phoenix Newspapers, Inc. v. Church*, 103 Ariz. 582, 447 P.2d 840 (1968), *cert. den.* 394 U.S. 959; *Spanel v. Pegler*, 70 F. Supp. 926 (D.C. Conn. 1946); *Mosler v. Whelan*, 28 N.J. 397, 147 A.2d 7 (1958); *Spanel v. Pegler*, 160 F.2d 619 (7th Cir. 1947); *Utah State Farm Bureau F. v. National Farmers Union Service Corp.*, 198 F.2d 20 (10th Cir. 1952); and *Gertz v. Robert Welch, Inc.*, 306 F. Supp. 310 (N.D. Ill. 1969). Also see: *Sas Jaworsky v. Padfield*, 211 So. 2d 122 (La. App. 1968).

The broadcast must be considered as a whole in determining whether it would convey to the ordinary listener the defamatory meaning which plaintiffs, by innuendo, seek to place upon it. *Cabrinha v. Hilo Trib. Herald*, 36 Haw. 355 (1943). If it is susceptible of both an innocent and a defamatory meaning, it is for the jury to determine the sense in which it was understood. *Tagawa v. Maui Pub. Co.* (hereinafter cited as *Tagawa I*), 49 Haw. 675, 427 P.2d 79 (1967). "The defamatory imputation may be made by innu-

endo, by figure of speech, by expressions of belief, by allusion, or by irony or satire." Restatement of Torts, Sec. 563, Comment *c* (1938). While each case depends on its own facts, publications which have conveyed by innuendo, in a manner similar to this broadcast, that an individual was a Communist or Communist sympathizer, have been held susceptible of a defamatory meaning. *Mosler v. Whelan*, 28 N.J. 397, 147 A.2d 7 (1958); *Foltz v. News Syndicate Co.*, 114 F. Supp. 599 (S.D.N.Y. 1953); *Faulk v. Aware, Inc.*, 155 N.Y.S.2d 726 (1956); *Phoenix Newspapers, Inc. v. Church*, 103 Ariz. 582, 447 P.2d 840 (1968). Also see *McKinnon v. Smith*, 275 N.Y.S.2d 900 (1966).

Here plaintiffs not only alleged that the broadcast contained the defamatory innuendo, but in answers to interrogatories plaintiff Emmett Cahill stated that persons named by him had been convinced by the statements uttered by defendants that he or some member of his family was a Communist or subversive or otherwise engaged in activities aimed at overthrow of the Government of the United States. We are, therefore, free from the question raised in *Baldwin v. Tribune-Herald*, 32 Haw. 87 (1931), whether a jury may ascribe a defamatory meaning to an ambiguous statement in the absence of evidence that some of its hearers placed such meaning upon it.

It is necessary also to consider whether there are defamatory meanings of which the broadcast is susceptible which embrace all of the plaintiffs. Defendants contend that plaintiff Timothy Cahill, who is not mentioned by name in the broadcast, cannot be considered as anywhere referred to in the broadcast and that the summary judgment should be sustained against him on this ground alone. We have no difficulty in viewing the term "Cahill family" as reasonably susceptible of a meaning which includes Timothy as well as the members of the family mentioned by name in the broadcast. The broadcast stated: "The *entire* Cahill Family leans far to the left, from the general Peace in Viet Nam movement to the *Communist Anarchists* Students for Democratic Society, S.D.S., of which daughter Winifred has been an active member." (Emphasis added) We cannot exclude from the

meanings of which this statement is reasonably susceptible one which attributes, to each member of the Cahill family, agreement with Communist and anarchist objectives. Given this meaning, the broadcast would be defamatory of all of the plaintiffs, including Timothy.

If the broadcast was not constitutionally protected, upon a finding by the jury that it conveyed the defamatory meaning which plaintiffs seek by innuendo to place upon it, it would be actionable per se. *Tagawa I; Pauling v. National Review Inc.*, 269 N.Y.S. 2d 11 (1966). We hold that the broadcast was susceptible of the defamatory meaning. Its falsity, given such meaning, is concededly an issue of fact in this case. It follows that summary judgment for defendants is sustainable, if at all, only upon the constitutional protections which they seek to invoke.

III

The First Amendment to the United States Constitution and Article I, Section 3 of the Hawaii Constitution, in identical terms, prohibit any law "abridging the freedom of speech or of the press." Commencing with *New York Times Co. v. Sullivan,* 376 U.S. 254 (1964), the United States Supreme Court has, in a series of cases, attempted to reconcile the constitutional guaranties of freedom of speech and of the press with common law and statutory liabilities for defamation. Finding "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open", the Court in *New York Times* ruled that a public official cannot recover damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with knowledge that it was false or with reckless disregard of whether it was false or not. At the time the circuit court considered and granted defendants' motion for summary judgment, the most relevant decision in this line of cases was *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29 (1971), in which the plurality of the Court ruled that, in actions for defamation of private individuals, "all discussion and communication involving matters of public or gen-

eral concern" is entitled to the same First Amendment protection as that afforded to comment upon the official conduct of a public official under *New York Times*.

A standard of liability predicated upon negligence was rejected by the plurality opinion in *Rosenbloom* on the ground that it would place on the press the burden of guessing how a jury might assess the reasonableness of steps taken to verify information, with the fear of guessing wrong inevitably causing self-censorship and the danger that legitimate utterance would be deterred. However, the five opinions in *Rosenbloom* reflected three differing views of the extent to which the First Amendment provides a defense to a claim for otherwise actionable defamation of a private individual, no one of which was adopted by a majority of the Court. In addition to the view of the plurality that the *New York Times* test should be applied if matters of public or general concern were involved, support was expressed for the view that a publisher should enjoy an absolute immunity from liability for defamation and support was also expressed for a third view that the level of constitutional privilege for defamatory falsehood depends upon the status of the person defamed, with the *New York Times* test to be applied in cases involving public figures, as well as public officials, but not in cases involving only private individuals. It seems probable that the circuit court adopted the view of the plurality in *Rosenbloom* in granting summary judgment, although we are not informed by the record.

During the pendency of this appeal, the United States Supreme Court, in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), adopted by a bare majority the third of the *Rosenbloom* views stated in summary form above. The Court confirmed that the protection of the *New York Times* privilege should be available to publishers and broadcasters of defamatory falsehoods concerning both public officials and public figures. Nevertheless, the Court recognized the legitimacy of society's interest in compensating individuals for the harm inflicted on them by defamatory falsehoods. To avoid "total sacrifice of the competing value served by the law of defamation" the Court rejected the view that the First Amendment protection is absolute. In order to avoid self-censorship by the

news media with respect to public officials and public figures, the Court saw a need to apply the highly protective *New York Times* standard. However, with respect to private individuals the Court found that a proper balancing of the interests calls for a substantial diminution in these protections, and held that the First Amendment, as extended to the states by the Fourteenth Amendment, does not protect a publisher or broadcaster from liability under state law for negligent publication of a falsehood defamatory of a private individual. The Court declared that "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." A qualification was added, to the effect that "the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth."

As defined in *Gertz,* therefore, the protections afforded by the First Amendment preclude imposition upon a publisher or broadcaster of liability to a private individual for the publication of a defamatory falsehood where no fault is established, but permit imposition of liability where at least ordinary negligence is shown. On the other hand, if the defendant's fault does not rise to the level required for liability to public officials and public figures, a private individual may recover compensation only for "actual injury". Such injury is not, however, limited to out-of-pocket loss and may include "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." 418 U.S. at 349, 350.

On the other hand, *Gertz* defined only the protections enjoyed by publishers and broadcasters under the First Amendment, leaving to the states the opportunity to enlarge these protections. The defendants would have us exercise the option so granted to the states by adopting the rule of the *Rosenbloom* plurality as governing the liability of the news media for defamatory falsehoods injurious to private individuals. We are aware of two courts which have done so.

In *Aafco Heating & Air Con. Co. v. Northwest Pub., Inc.,* 321 N.E.2d 580 (Ind. App. 1974), decided by the Court of Appeals of Indiana, Third District, the rule of the *Rosenbloom* plurality was followed. The court emphasized concern that a rule imposing liability for failure to use reasonable care, as permitted by *Gertz,* would lead to unacceptable self-censorship on the part of the news media. The standard adopted and applied would require a private individual who brings a libel action involving an event of general or public interest to prove that the defamatory falsehood was published with knowledge of its falsity or with reckless disregard whether it was false.

In *Walker v. Colorado Springs Sun, Inc.,* 538 P.2d 450 (Colo. 1975), the Colorado Supreme Court divided 5-2 with respect to the standard to be applied in such cases. The majority adopted the rule of the plurality in *Rosenbloom,* "with the limitation that 'reckless disregard' for whether or not a statement is true does not mean that there must be a finding that the person making the statement had serious doubts as to the truth thereof." In thus rejecting the test of reckless disregard announced in *St. Amant v. Thompson,* 390 U.S. 727 (1968), the majority referred to the "usage of the term in the tort field in this state" without any further attempt at definition. The dissenting justices would have imposed a standard of negligence rather than the modified recklessness standard adopted by the majority.

We have not previously attempted expressly to strike a balance between the interest in avoiding self-censorship by the news media and the interest in recompensing individuals for harm from defamatory falsehoods. We applied the *New York Times* test to defamation of a public official in *Tagawa v. Maui Pub. Co.* (hereinafter cited as *Tagawa II*), 50 Haw. 648, 448 P.2d 337 (1968). In *Aku v. Lewis,* 52 Haw. 366, 477 P.2d 162 (1970), we had before us an action by a private individual for defamatory falsehood published by means of radio and television broadcasts. The defamatory statement related to a telephone solicitation campaign for the sale of tickets to a benefit program, in the course of which some 2000 persons had been contacted. The question was not raised whether an

event of general or public interest was involved. We agreed with the lower court that *New York Times* was not applicable and that the applicable standard of liability was that of negligence. Negligence was found in that defendants did not have any reasonable ground to believe the defamatory statement was true and in publishing it failed to exercise reasonable care. The opinion contains the following which we view as significant in the present context:

> In adopting the standard of reasonable care, we conclude that it is in society's interest in these circumstances to make defaming publishers less willing to speak due to the risk of being found negligent. (52 Haw. at 378)

Had the rule which we are now asked to adopt then been in effect, the question in *Aku v. Lewis* would have been whether the defamatory statement involved an event of general or public interest. The allegedly fraudulent ticket solicitation in *Aku v. Lewis* seems to reach the requisite level of public interest.[2] Nevertheless, we did not then consider it appropriate to announce a rule which would protect the broadcaster from liability for negligence.

In considering whether we should now follow the course indicated by the Indiana and Colorado courts and broaden the protection enjoyed by the news media as against private individuals, we should clearly define the judicial process at work. The doctrines of the law of defamation have evolved through case-by-case development in judicial decisions, subject to the impact of constitutional interpretation. *Rosenbloom* and *Gertz* represent opposing views as to the extent of the impact of the First Amendment upon this body of case law. We are bound by the decisions of the United States Supreme Court with respect to this question, and could not apply in this case a rule which would deny to defendants the

---

[2] The test stated in the plurality opinion in *Rosenbloom* was that "the utterance involved concerns an issue of public or general concern, albeit leaving the delineation of the' reach of that term to future cases." 403 U.S. at 44. The American Law Institute, Restatement of Torts (Second) Sec. 581B (Tentative Draft No. 20, April 25, 1974) suggests that the term includes, inter alia, events which affect the public welfare, the public health, the public safety, the public convenience or the public morals.

protections afforded by the First Amendment as interpreted in *Gertz*. These protections prevent the imposition of liability under state law for defamation of a private individual by the news media only where fault is absent. The degree of fault which will occasion liability, in a range between ordinary negligence and conscious or reckless falsehood, has been declared to be free from First Amendment controls. By thus partially removing the limitations indicated in *Rosenbloom,* the Court in *Gertz* restored to the state courts the responsibility for developing the law in this area which they possessed and exercised before more extensive First Amendment limitations on liability were suggested.

If we were to follow the Indiana and Colorado courts, we might do so in exercise of our responsibility to achieve the orderly development of the law of defamation with a consistent basic rationale, or we might find that Article I, Sec. 3 of the Hawaii Constitution provides such protection of the news media against liability for defamation.[3] Action upon the first ground would require that we depart from the rule announced in *Aku v. Lewis*. Action upon the second ground would require that we discover that the Hawaii Constitution, while using

---

[3] The opinions of the Indiana and Colorado courts do not clearly disclose which ground of action was relied upon by those courts. Their reasoning is expressed in the following excerpt from the opinion in *Aafco,* as quoted in *Walker:*

The United States Supreme Court recognized in New York Times Co. v. Sullivan, *supra,* that a rule requiring the media to guarantee the truth of its news reporting would lead to self-censorship. Publishers, fearful of being unable to prove the truth of their statements, would avoid the publication of controversial articles. We refuse to adopt a rule that would allow private citizens to obtain damage judgments on the basis of a jury determination that a publisher probably failed to use reasonable care. Such a rule would promote self-censorship by causing publishers to "steer far wider of the unlawful zone." Speiser v. Randall (1958), 357 U.S. 513, 526, 78 S. Ct. 1332, 1342, 2 L.Ed. 2d 1460. The uncertainty attendant upon a reasonable care standard would charge the press with "the untolerable burden of guessing how a jury might assess the reasonableness of steps taken by it to verify the accuracy of every reference to a name, picture or portrait." Time, Inc. v. Hill, *supra,* 385 U.S. [374] at 389, 87 S. Ct. [534] at 543 [17 L.Ed.2d 456]. A publisher's fear of guessing wrong about juror assessment of the reasonableness of the news gathering procedures he employs would inevitably deter "protected" speech. Furthermore, the standard of proof employed in libel actions heightens the risk of self-censorship inherent in a "reasonable care" standard of media privilege. 538 P.2d 450 at 458.

substantially identical words to define the constitutional protection of speech and the press, effects a more substantial limitation upon the liability of the news media than does the First Amendment.

We are faced with the same dilemma which led to the five opinions in *Rosenbloom* and the six opinions in *Gertz,* and which divided the court in *Walker v. Colorado Springs Sun.* The *Rosenbloom* rule spans a broad spectrum of possible cases. By predicating liability only on knowledge of falsity or reckless disregard for truth, with recklessness requiring serious doubts as to truth, the *Rosenbloom* rule would deny recovery by a private individual even where there was "a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers" (the test advocated by Justice Harlan in *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 155 (1967)), if the publisher did not in fact know that the statement was false or did not in fact entertain serious doubts as to its truth. *St. Amant v. Thompson,* 390 U.S. 727 (1968). As we said in *Tagawa II,* this standard of liability would deny recovery despite a showing of a "bad or corrupt motive" or "personal spite, ill will or desire to injure the plaintiff."

We find it difficult to see in the Hawaii Constitution a purpose to afford more extensive privileges to the news media than have been found in the First Amendment. We find it equally difficult to conclude that considerations of public policy require us to extend the developed doctrines of the law of defamation to achieve this result.[4] It must not be overlooked that *Gertz* introduced a significant constitutional limitation upon the damages recoverable by a private individual

---

[4] Tentative Draft No. 21, April 5, 1975 of the American Law Institute, Restatement of the Law of Torts (Second) Sec. 580B, rejects such an extension. The position is taken, in light of *Gertz,* that a professional disseminator of news who publishes a false and defamatory communication concerning a private person is subject to liability if he acts negligently in failing to ascertain that the statement is false and that it defames the other, and is held to the skill and experience normally possessed by members of that profession in determining whether he acted reasonably.

from a publisher or broadcaster who is guilty only of negligence in ascertaining the truth of its assertions. By foreclosing awards of presumed or punitive damages in such cases, the Court materially reduced the exposure of the news media and reduced the weight of the considerations which led to the original announcement of the *Rosenbloom* doctrine.

The plurality opinion in *Rosenbloom* and the decisions of the Indiana and Colorado courts cited are founded on the intuitive finding of the Justices,[5] unaided by any empirical evidence, that exposure of the news media to liability for negligence in actions by private individuals for defamatory falsehoods has unduly restrained their freedom of expression. We have not been referred to any instance in which a matter of general or public interest has not been adequately reported because of self-censorship on the part of the news media. We do not have the means to develop empirical evidence to confirm or refute the intuitive findings of the *Rosenbloom* plurality. The nature and scope of the investigation which would be required for this purpose may be more suitable to a legislative resolution of this issue than one achieved by judicial decision. Moreover, experience with the public interest test of *Rosenbloom* has indicated that there are difficulties in its application.[6] Under these circumstances, we will refrain from announcing at this time any change in the standard of liability to private individuals declared in *Aku v. Lewis*, reserving the question for further consideration when and if it is presented to us in a manner which satisfies the concerns just expressed. The test of liability to be applied in this case is that of negligence, unless plaintiffs were "public figures", which question is considered in Part IV of this opinion.

---

[5] Differences between the provisions of the Indiana and Colorado constitutional provisions as to free speech and press, as compared with the First Amendment, might somewhat explain the preference of these courts for the *Rosenbloom* rule.

[6] See comments in 48 Temp.L.Q. 450, 459 (1975); 12 San Diego L.R. 455, 460 (1975). Apparently, it was these difficulties which caused the *Gertz* court to "doubt the wisdom of committing this task to the conscience of judges." 418 U.S. at 346.

There remains for consideration, before we turn to Part IV, whether a genuine issue of fact existed with respect to the negligence of defendants. If, as we are required to do for this purpose, it is assumed that the statement falsely labelled plaintiffs as Communists engaged in subversive activities, the question becomes whether defendants had reasonable grounds to believe that these charges were true. The affidavit of defendant Dickinson discloses no asserted ground for believing that these charges were true other than the facts set forth in memoranda prepared by Jay Field, which were embodied in the defamatory statement. As in *Aku v. Lewis,* we hold that the question whether defendants were negligent in relying on these memoranda and in inferring therefrom that the defamatory charges were true was for the jury to determine. An issue of fact existed with respect to defendants' negligence under all the circumstances of this case.[7]

---

[7] Although not yet finally acted upon by the American Law Institute, the following comment to Sec. 580B in Tentative Draft No. 21 of the Restatement of Torts (Second) is suggestive and useful here:

   *g Factors in applying the negligence standard.* In determining whether the defendant acted as a reasonable prudent person under the circumstances in publishing the defamatory communication on the basis of his check or lack of check as to its accuracy and as to its defamatory character, there are factors to be taken into consideration. The thoroughness of the check which a reasonable man would make before he published the statement may vary with the play of these factors. The standard of care does not change, but its application may vary with the circumstances. One factor is the time element. Was the communication a matter of topical news requiring prompt publication to be useful, or was it one in which time and opportunity were freely available to investigate? In the later situation, due care may require a more thorough investigation. A second factor is the nature of the interests which the defendant was seeking to promote by publishing the communication. Informing the public as to a matter of public concern is an important interest in a democracy; spreading of mere gossip is of little importance. How necessary was this communication to these recipients in order to protect the interest involved? If there was no substantial interest to protect in publishing the communication to these recipients, then a reasonable person would be hesitant to publish the communication unless he was convinced that it was accurate.

   A third factor is the extent of the damage to the plaintiff's reputation or the injury to his sensibilities which would be produced if the communication proves to be false. Was the communication defamatory on its face? Would its defamatory connotation be known only to a few? How extensive was the dissemination? How easily might the plaintiff protect his reputation by means at his own disposal?

Since *Gertz*, a private individual may recover damages only for actual injury resulting from the negligent publication of a defamatory falsehood by a publisher or broadcaster. No issue with respect to this requirement has been raised in this case. As we have remarked earlier, plaintiffs' answers to interrogatories asserted actual impairment of reputation and actual injury as defined in *Gertz*, and a genuine issue of fact exists with respect thereto.

In view of the disposition made of this case, we have not considered whether the circuit court correctly found that there was no evidence of knowledge of falsity or reckless disregard of truth on the part of defendants, necessary under *Gertz* for the recovery by plaintiffs of presumed or punitive damages.

IV

We turn now to the question whether defendants may invoke the First Amendment protections announced in *Gertz* as against claims for defamation of "public figures". Defendants contend that there is no genuine issue of fact whether plaintiffs are public figures with respect to the subject matter of the broadcast, against whom defendants are entitled to the protection of the rule stated in *Gertz*. As conclusively evidencing that plaintiff Emmett Cahill was a public figure, defendants assert that the facts before the court on the motion for summary judgment showed that he had issued a public statement criticizing the position of the Mayor of Honolulu on the sentencing practices of local judges and had a year earlier assumed the co-chairmanship of the Hawaii Table Grape Boycott Committee and publicly advocated a boycott, all of which was reported in Honolulu newspapers. As to the other members of the Cahill family, it is argued that their close relationship or association with a public figure made them public figures as well. It is also asserted as a supporting consideration that they had been publicly depicted in newspapers as exerting a considerable influence on Emmett Cahill, a public figure.

The motion for summary judgment was considered by the circuit court upon affidavits of defendant Dickinson and of Jay Field, upon whose research Mr. Dickinson relied; interrogatories propounded to the plaintiffs; interrogatories propounded to defendant Dickinson and the deposition of defendant Watumull. We have carefully examined these materials, and find that they do not establish that there is no genuine issue of fact as to the status of plaintiffs, or any of them, as public figures. In large part, the affidavits state only that certain newspaper reports referring to the plaintiffs were published, and fail to state that the newspaper accounts were true of affiant's own knowledge. Rule 56(e), H.R.C.P., requires that affidavits in support of or opposing a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matter stated therein." To the extent that the affidavits did not comply with this rule they should be disregarded. *Sprague v. Vogt*, 150 F.2d 795 (8th Cir. 1945); *Fowler v. Southern Bell Telephone & Telegraph Co.*, 343 F.2d 150 (5th Cir. 1965); *New York Life Ins. Co. v. Wilkinson Veneer Co.*, 86 F. Supp. 863 (E.D.La. 1949); *Securities and Exchange Comm. v. Latta*, 250 F. Supp. 170 (N.D. Calif. 1965).

When the proper excisions have been made, we find in the record as facts bearing upon the status of plaintiffs as public figures only that plaintiff Emmett Cahill had been a member or otherwise affiliated with several organizations with political objectives and an officer of one, the Hawaii Table Grape Boycott Committee, of which he had been co-chairman; that he had testified before a committee of the Hawaii Legislature with respect to proposed legislation dealing with penalties for marijuana possession; that he was executive director or president of the John Howard Association; and that he had issued a public statement criticizing an opinion expressed by the Mayor of Honolulu which deplored the leniency of local judges in imposing light sentences on convicted criminals, in which statement plaintiff commended the job being done by the judges. The record also reveals that plaintiffs had been mentioned in various news stories published in local news-

papers. The texts of these news stories were available to the court for the purpose of showing what media notoriety had been given to the plaintiffs, but not for the purpose of establishing the truth of the facts reported.

As was said in *Gertz*,

Respondent's characterization of petitioner as a public figure raises a different question. That designation may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions. 418 U.S. at 351

Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life. It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation. 418 U.S. at 352

On the facts before it, the Court in *Gertz* found that the trial court had properly refused to characterize the plaintiff as a public figure notwithstanding that he had long been active in community and professional affairs and had served as an officer of local civic groups and of various professional organizations. The Court pointed out that the plaintiff had not discussed the subject matter of the particular controversy with the press or been quoted as doing so, and said: "He plainly did not thrust himself into the vortex of this public issue, nor did he engage the public's attention in an attempt to influence its outcome." 418 U.S. at 352.

The concept of a "public figure", who is to be equated with a public official for the purpose of the *New York Times* test, received its definitive expression in *Gertz*. The Court left for case by case development the "nature and extent of an

individual's participation in the particular controversy'' which will transfer him from private status to that of a public figure.[8]

In the case before us, we are insufficiently informed as to the circumstances or text of the public statement made by plaintiff Emmett Cahill, e.g., whether plaintiff spoke only in a representative capacity as an officer of the John Howard Association, whether there existed a "public controversy" as to the outcome of which plaintiff's statement was so significant that plaintiff had become "intimately involved" in its resolution, and whether the controversy involved the resolution of an "important public question" such that comment on the character and motivation of participants should be afforded constitutional protection. Without attempting to define precisely what circumstances should be taken into consideration in determining whether plaintiff Emmett Cahill was a public figure within the meaning of *Gertz*, we have concluded that the record before us does not enable the question to be determined and that it should be approached on a full trial record. *Cf. Gordon v. Random House, Inc.*, 486 F.2d 1356 (3rd Cir. 1973). Since the status of the other members of the Cahill family as public figures, on defendants' theory, is dependent on first establishing the status as a public figure of plaintiff Emmett Cahill, the same considerations apply to them. We conclude that, on the record before the circuit court and for the purpose of defendants' motion for summary judgment, there was a genuine issue of fact whether any of the plaintiffs were public figures in the context of the subject matter of the broadcast.

In view of the disposition of this appeal, there is no occasion at this time to consider plaintiffs' claim for invasion of privacy.

---

[8] Some guidance may be found in the Court's repetition of the reference of Chief Justice Warren in Curtis Publishing Co. v. Butts, 388 U.S. 130, 164 (1967) to nonpublic officials who "are nevertheless intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large." 418 U.S. at 337.

The judgment as to defendant Watumull is affirmed. As to defendants Hawaiian Paradise Park Corporation and Dickinson, the judgment is reversed and the case is remanded to the circuit court for further proceedings in conformity with this opinion.

*Joseph A. Ryan (Ryan & Ryan* of counsel) for plaintiffs-appellants

*Edward R. Bendet (Whitfield Bendet & Fidell* of counsel) for defendants-appellees